IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CLEOPATRA DE LEON, NICOLE DIMETMAN, VICTOR HOLMES, and MARK PHARISS | § § § § | |
| | § | |
| Plaintiffs, | § § | |
| | § | CIVIL ACTION NO. 5:13-cv-982-OLG |
| v. | § § | |
| RICK PERRY, in his official capacity as Governor of the State of Texas, GREG ABBOTT, in his official capacity as Texas Attorney General, GERARD RICKHOFF, in his official capacity as Bexar County Clerk, and DAVID LAKEY, in his official capacity as Commissioner of the Texas Department of State Health Services | § § § § § § § § § § | |
| Defendants. | § § | |

PLAINTIFFS' OPPOSED MOTION FOR PRELIMINARY INJUNCTION ENJOINING
DEFENDANTS FROM ENFORCING TEXAS' SAME-SEX MARRIAGE BAN

## TABLE OF CONTENTS

*Preliminary Statement*............................................................................................1

FACTUAL BACKGROUND ...................................................................................5
   I.    Plaintiffs' Background ..............................................................................5
         A.    De Leon and Dimetman Are Lawfully Married and Proud Parents............5
         B.    Holmes and Phariss Have Been Together More Than 16 Years and
              Want To Marry One Another..........................................................6
   II.   Texas' Constitution and Statutes Unconstitutionally Ban Same-Sex
       Marriage. ...............................................................................................7
         A.    The Texas Legislature Banned Same-Sex Marriage in 1997 And
              Broadened the Ban By Enacting Texas' Defense of Marriage Act in
              2003.............................................................................................7
         B.    After Twice Banning Same-Sex Marriage In Its Statutes, Texas
              Added A Constitutional Amendment Banning Same-Sex Marriage...........9
  III.   Defendants Are Responsible For Enforcing Texas's Marriage Prohibition...........11
  IV.   Section 32 Causes Numerous Harms To Plaintiffs and All Similarly
       Situated Same-Sex Couples. ....................................................................11
         A.    Plaintiffs' Inability To Marry Affects Numerous Federal
              Protections, Benefits, And Obligations.....................................................11
         B.    Plaintiffs' Inability To Marry Affects Numerous State-Law
              Protections, Benefits, And Obligations.....................................................13

ARGUMENT ........................................................................................................14
   I.    The Refusal To Marry Same Sex Couples Violates Due Process And Equal
       Protection Under The United States Constitution..................................................14
         A.    The Denial Of The Right To Marry Deprives Plaintiffs Holmes
              And Phariss Of Due Process....................................................................15
         B.    The Denial Of The Right To Marry Deprives Plaintiffs Holmes
              And Phariss Of Equal Protection. .............................................................17
              1.    Texas' Same-Sex Marriage Ban Should Be Subject To
                   Heightened Scrutiny....................................................................18
                  a.    Heightened Scrutiny Applies Because Gays and
                        Lesbians Suffer a Long History of Discrimination...........19
                  b.    Heightened Scrutiny Applies Because Sexual
                        Orientation Is Not Related to the Ability of Gays
                        and Lesbians to Contribute to Society. ............................23
                  c.    Heightened Scrutiny Applies Because Sexual
                        Orientation is Immutable. ...............................................24
                  d.    Heightened Scrutiny Applies Because Gay Men and
                        Lesbians Lack Political Power to Eliminate
                        Significant Constitutional and Statutory
                        Disadvantages. ...............................................................26
               2.    Past Cases Holding That Equal Protection Challenges By
                     Gays And Lesbians Are Not Subject To Heightened
                     Scrutiny Are Not Controlling.......................................................28

C.    Texas' Same Sex Marriage Ban Fails Both Heightened Scrutiny And Rational Basis Examination. ............................................................30

    1.    Rather than Encouraging Stable Environments for Procreation, The Same-Sex Marriage Ban Destabilizes Them. ...................................................................................................32

    2.    Rather Than Encouraging Stable Environments for Child-Rearing, The Same-Sex Marriage Ban Destabilizes The Environment For All Children of Same-Sex Couples...................36

    3.    Section 32 Impermissibly Targets Homosexuals. ...........................40

D.    The Refusal To Recognize Same-Sex Marriages Lawfully Performed In Other States Deprives Plaintiffs De Leon and Dimetman Equal Protection And Due Process. .........................................41

E.    *Baker v. Nelson* Is No Longer Binding Precedent Because Subsequent Cases Undermined Its Reasoning. .........................................45

II.    The Court Should Issue A Preliminary Injunction Against Defendants' Enforcement Of Section 32.................................................................................47

*Conclusion* ............................................................................................................................49

204156357 v8

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Able v. United States,*
  155 F.3d 628 (2d Cir. 1998)..................................................................29

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995)............................................................................19

*Baker v. Nelson,*
  191 N.W.2d 185 (Minn. 1971)........................................................45, 46

*Baker v. Nelson,*
  409 U.S. 810 (1972)........................................................................15, 45

*Baker v. State,*
  744 A.2d 864 (Vt. 1999)..................................................................33, 36

*Baker v. Wade,*
  769 F.2d 289 (5th Cir. 1985) .....................................................20, 46, 47

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
  531 U.S. 356 (2001)............................................................................33

*Ben-Shalom v. Marsh,*
  881 F.2d 454 (7th Cir. 1989) .....................................................20, 28, 29

*Bowen v. Gilliard,*
  483 U.S. 587 (1987)............................................................................18

*Bowers v. Hardwick,*
  478 U.S. 186 (1986)............................................................................20

*Braddock v. Taylor,*
  592 S.W.2d 40 (Tex. Civ. App. 1979)..................................................41

*Carey v. Population Servs. Int'l,*
  431 U.S. 678 (1977)............................................................................17

*Chambers v. Florida,*
  309 U.S. 227 (1940)..............................................................................3

*Childers v. Dallas Police Dep't,*
  513 F. Supp. 134 (N.D. Tex. 1981) ......................................................22

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985).......................................................17, 18, 23, 31

iii

*City of Dallas v. England,*
    846 S.W.2d 957 (Tex. App. 1993)................................................................22

*Clark v. Jeter,*
    486 U.S. 456 (1988)................................................................................30

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
    661 F. 2d 328 (5th Cir. 1981) ..................................................14, 47, 48

*Dep't of Agri. v. Moreno,*
    413 U.S. 528 (1973)..........................................................................40, 42

*Duncan v. Cessna Aircraft Co.,*
    665 S.W.2d 414 (Tex. 1984)......................................................................42

*Elrod v. Burns,*
    427 U.S. 347 (1976)................................................................................48

*Equality Found. of Greater Cincinnati, Inc. v. Cincinnati,*
    860 F. Supp. 417 (S.D. Ohio 1994) ..........................................................23

*Frontiero v. Richardson,*
    411 U.S. 677 (1973)........................................................................28, 46

*Giovani Carandola, Ltd. v. Bason,*
    303 F.3d 507 (4th Cir. 2002) ..................................................................47

*Goldman v. Weinberger,*
    475 U.S. 503 (1986)................................................................................29

*Golinski v. U.S. Office of Pers. Mgmt.,*
    824 F. Supp. 2d 968 (N.D. Cal. 2012) ..................................... passim

*Goodridge v. Dep't of Public Health,*
    798 N.E.2d 941 (Mass. 2003) ......................................................33, 34, 39

*Griswold v. Connecticut,*
    381 U.S. 479 (1965)........................................................................15, 44

*Head v. Newton,*
    596 S.W.2d 209 (Tex. App. 1980)..............................................................22

*Heller v. Doe,*
    509 U.S. 312 (1993)................................................................................31

*Hernandez-Montiel v. INS,*
    225 F.3d 1084 (9th Cir. 2000) ..................................................................25

*Hicks v. Miranda*,
   422 U.S. 332 (1975)..................................................................................................46

*High Tech Gays v. Def. Indus. Sec. Clearance Office*,
   895 F.2d 563 (9th Cir. 1990) ...........................................................19, 28, 29

*Husband v. Pierce*,
   800 S.W.2d 661 (1990)............................................................................................41

*Ill. State Bd. of Elec. v. Socialist Workers*,
   440 U.S. 173 (1979)..................................................................................................46

*In re Marriage Cases*,
   43 Cal.4th 757 (2008) ............................................................................................28

*In re Marriage of J.B. and H.B.*,
   326 S.W.3d 654 (Tex. App. 2010)....................................................................42

*Ingebretsen v. Jackson Pub. Sch. Dist.*,
   88 F.3d 274 (5th Cir. 1996) ................................................................................47

*Johnson v. Johnson*,
   385 F.3d 503 (5th Cir. 2004) ............................................................................30

*Jornaleros de Las Palmas v. City of League City*,
   Civil Action No. H-11-2703, 2013 WL 2180013 (S.D. Tex. May 17, 2013)..........48

*Lawrence v. Texas*,
   539 U.S. 558 (2003).........................................................................................passim

*Loving v. Virginia*,
   388 U.S. 1 (1967)...........................................................................1, 2, 15, 16

*Lyng v. Castillo*,
   477 U.S. 635 (1986)..................................................................................................18

*M.L.B. v. S.L.J.*,
   519 U.S. 102 (1996)...........................................................................................1, 15

*Mandel v. Bradley*,
   432 U.S. 173 (1977)..................................................................................................45

*Mass. Bd. of Ret. v. Murgia*,
   427 U.S. 307 (1976)..................................................................................................18

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
   682 F.3d 1 (1st Cir. 2012)......................................................................................16

v

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)................................................................................................15

*Nevada v. Hall*,
    440 U.S. 410 (1979)................................................................................................42

*Nevarez v. Bailon*,
    287 S.W.2d 521 (Tex. Civ. App. 1956)................................................................42

*Nyquist v. Mauclet*,
    432 U.S. 1 (1977)...................................................................................................24

*Obergefell v. Kasich*,
    No. 1:13–cv–501, 2013 WL 3814262 (S.D. Ohio July 22, 2013) ....................44, 45

*Pedersen v. Office of Pers. Mgmt.*,
    881 F. Supp. 2d 294 (D. Conn. 2012) ............................................................ passim

*Perry v. Brown*,
    671 F.3d 1052 (9th Cir 2012) ...............................................................................34

*Perry v. Schwarzenegger*,
    704 F. Supp. 2d 921 (N.D. Cal. 2010) ........................................................... passim

*Pers. Admin. of Mass. v. Feeney*,
    442 U.S. 256 (1979)...............................................................................................18

*Planned Parenthood of Southeastern Pa. v. Casey*,
    505 U.S. 833 (1992)...........................................................................................2, 15

*Plessy v. Ferguson*,
    163 U.S. 537 (1896).................................................................................................2

*Plyler v. Doe*,
    457 U.S. 202 (1982) ..................................................................................... passim

*Portwood v. Portwood*,
    109 S.W.2d 515 (Tex. Civ. App. 1937) ...............................................................41

*Romer v. Evans*,
    517 U.S. 620 (1996)...................................................................................... passim

*Seth v. Seth*,
    694 S.W.2d 459 (Tex. App. 1985).........................................................................42

*Skinner v. Oklahoma ex rel. Williamson*,
    316 U.S. 535 (1942)...............................................................................................42

204156357 v8

*Steffan v. Perry,*
   41 F.3d 677 (D.C. Cir. 1994)..................................................................................25

*Tex. Emp'r Ins. Ass'n v. Borum,*
   834 S.W.2d 395 (Tex. App. 1992)..........................................................................41

*Thomas v. Bynum,*
   No. 04-02-00036-CV, 2002 WL 31829509 (Tex. App. Dec. 18, 2002)...................22

*Turner v. Safley,*
   482 U.S. 78 (1987)...................................................................................16, 31, 45

*United States v. Virginia,*
   518 U.S. 515 (1996).................................................................................................31

*United States v. Windsor,*
   133 S. Ct. 2675 (2013)..............................................................................................2

*Varnum v. Brien,*
   763 N.W.2d 862 (Ia. 2009) ...............................................................................32, 39

*Watkins v. U.S. Army,*
   875 F.2d 699 (9th Cir. 1989) ...................................................................................23

*Williams v. Illinois,*
   399 U.S. 235 (1970).................................................................................................32

*Zablocki v. Redhail,*
   434 U.S. 374 (1978)....................................................................................... passim

**STATUTES**

8 U.S.C.
   § 1182(a)(4) (1982)..................................................................................................21

29 U.S.C.
   § 2612.......................................................................................................................11

42 U.S.C.
   § 416.........................................................................................................................11
   § 1983.......................................................................................................................17

Immigration Act of 1917, Pub. L. No. 64-301
   § 3, 39 Stat. 874 (1917)............................................................................................21

Immigration Act of 1990, Pub. L. No. 101-649
   § 601, 104 Stat. 4978 (1990)....................................................................................21

204156357 v8

Immigration and Nationality Act Pub. L. No. 89-236
  § 15(b), 79 Stat. 911 (amended Oct. 3, 1965)....................................................21

Tex. Civ. Prac. & Rem. Code
  § 71.004................................................................................................................13

Tex. Fam. Code
  § 1.101..................................................................................................................41
  § 2.001..................................................................................................1, 7, 11, 49
  § 2.002..................................................................................................................11
  § 2.004..................................................................................................................11
  § 2.005..................................................................................................................11
  § 2.008..................................................................................................................11
  § 3.003..................................................................................................................13
  § 6.204.............................................................................................................passim
  § 7.001..................................................................................................................13
  § 7.003..................................................................................................................13
  § 8.051..................................................................................................................13

Tex. Health & Safety Code
  § 85.007................................................................................................................22
  § 191.002..............................................................................................................11
  § 194.0011(a)........................................................................................................11

Tex. Labor Code
  § 21.051................................................................................................................13

Tex. Probate Code
  § 38......................................................................................................................13
  § 45......................................................................................................................13

Tex. Prop. Code
  § 301.021..............................................................................................................13
  § 301.026..............................................................................................................13

Texas Penal Code
  § 21.06..................................................................................................................22

**OTHER AUTHORITIES**

Am. Acad. of Child & Adolescent Psychiatry, *Gay, Lesbian, Bisexual, or Transgender
  Parents Policy Statement* (2009) ........................................................................38

Am. Acad. of Pediatrics, *Coparent or Second-Parent Adoption by Same-Sex Parents*,
  Feb. 2002..............................................................................................................38

Am. Anthropological Ass'n, *Statement on Marriage and the Family* (Feb. 26, 2004) .................35

Am. Psychiatric Ass'n, *Position Statement on Support of Legal Recognition of Same-Sex Civil Marriage* (July 2005) .................................................................................37

Am. Psychological Ass'n, *Answers to Your Questions For A Better Understanding of Sexual Orientation & Homosexuality* .................................................................38

Am. Psychological Ass'n, *Sexual Orientation, Parents, & Children* (July 2004) .......................38

American Forces Press Service, *Hagel: States Denying Same-Sex Family Benefits Must Comply* ...................................................................................................22

American Psychological Association, *Answers to Your Questions For A Better Understanding of Sexual Orientation & Homosexuality* (2008) .............................................19

Andrew Koppelman, *The Difference the Mini-DOMAs Make*, 38 Loy. U. Chi. L.J. 265 (2007) ...................................................................................................27

Campbell Robertson, *Ban on Gay Marriage Passes in North Carolina*, N.Y. Times, May 9, 2012 ..................................................................................................27

Child Welfare League of Am., *Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults* ...............................................................................39

Chris Tomlinson, *Texas National Guard Commander Asks for Legal Opinion on Same Sex Military Benefits*, Tyler Morning Telegraph (Sept. 6, 2013) .............................................12

Ellen C. Perrin, Benjamin S. Siegel, and the Committee on Psychosocial Aspects of Child and Family Health, *Promoting the Well-Being of Children Whose Parents Are Gay or Lesbian*, 131 Pediatrics 1374, 1377 (Apr. 2013) ..................................................................36

Exec. Order 11478, 34 Fed. Reg. 11478 (Aug. 8, 1969) .............................................21

Exec. Order No. 10450, 18 Fed. Reg. 2489 (1953) ....................................................20

Exec. Order No. 13087, 63 Fed. Reg. 30097 (June 2, 1998).........................................21

FBI, *Hate Crime Statistics 2011*, http://www.fbi.gov/about-us/cjis/ucr/hate-crime/2011/tables/table-1 ....................................................................................19

G.M. Herek, et al. *Demographic, Psychological, and Social Characteristics of Self–Identified Lesbian, Gay, and Bisexual Adults in a U.S. Probability Sample*, 7 Sexuality Res. & Soc. Pol'y 176 (2010) ..................................................................25

H.B. 1326, 80th Leg., Reg. Sess. (Tex. 2007) ..........................................................22

H.B. 2156 and H.B. 604, 82d Leg., Reg. Sess. (Tex. 2011) .........................................22

H.B. 3026, 81st Leg., Reg. Sess. (Tex. 2009)...........................................................22

204156357 v8

H.B. 3232, H.B. 1701, and S.B. 538, 83rd Leg., Reg. Sess. (Tex. 2013)......................................22

H.B. 38, 78th Leg., Reg. Sess. (Tex. 2003) ..............................................................................7

H.J.R. 6, 79th Leg., Reg. Sess. (Tex. 2005).............................................................................9

H.J.R. Res. 6, 79th Leg. (Tex. 2005) ....................................................................................27

House Journal, 79th Leg., Reg. Sess. (Tex. Apr. 25, 2005)............................................................9

House Research Org., Bill Analysis, 79th Leg., Reg. Sess. (Tex. 2005)....................................9, 32

House Research Org., Daily Floor Report, 78th Leg., Reg. Sess. (Tex. April 29, 2003)...............8

House Research Org., Focus Report on Amendments Proposed for the 2005 Ballot, 79th
    Leg., Reg. Sess. (Tex. 2005)...............................................................................................10

House Research Org., Report on Major Issues, 78th Leg., Reg. Sess. (Tex. 2003) ................8, 40

Janet Elliott, *Gay Marriage Ban Put in Texas Constitution*, Houston Chronicle, Nov. 9,
    2005.................................................................................................................................10

Jeremy W. Peters, *Openly Gay, and Openly Welcomed in Congress*, N.Y. Times, January
    26, 2013..........................................................................................................................26

Jessica Leeder, *Parental Consent Bill Signed into Law: Ceremony at Christian School in
    Fort Worth Draws 250 Protesters*, Dallas Morning News, June 6, 2005...............................10

Josh Hicks, *Texas National Guard Denies Benefits for Same-Sex Spouses*, The
    Washington Post (September 4, 2013)..................................................................................12

R.A. Dyer, *Gay-rights group demands apology*, Fort Worth Star-Telegram, June 10, 2005........10

Rachel Stone, *Same-Sex Marriage Ban Goes to Perry; Governor Expected to Sign Bill
    that Got Only 9 'No' Votes in House*, San Antonio Express-News, May 1, 2003 ....................8

S.B. 7, 78th Leg., Reg. Sess. (Tex. 2003)..................................................................................7

S. Doc. No. 241, Employment of Homosexuals and Other Sex Perverts in Government,
    81st Congress (1950) .........................................................................................................21

Tex. Const. Art. I, Sec. 32........................................................................................11, 49

Tex. R. Evid. 504 .............................................................................................................13

Tex. S.B. 7, 78th Leg., Reg. Sess. (Tex. 2003)...........................................................................27

Zahira Torres, *Gay El Paso rep writes self into Texas Legislature history*, El Paso Times,
    Jan. 9, 2013 .............................................................................................................26, 27

204156357 v8

### *Preliminary Statement*

Plaintiffs request that this Court immediately enter an order preliminarily enjoining Defendants from enforcing Article I, section 32 of the Texas Constitution and corresponding provisions in the Texas' Family Code (collectively, "Section 32").[1]  Section 32 denies Plaintiffs access to the institution of marriage, its numerous rights, privileges, and responsibilities, for the sole reason that they love and wish to be married to a person of the same sex.  As such, Section 32 violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  The Constitution requires that these laws be declared unenforceable.  Justice requires that this relief be afforded immediately, fully, and for all time.

In a society that celebrates marriages of long duration, these Plaintiffs are unlikely ever to celebrate the milestones many of our parents achieved because Section 32 expressly deems them unworthy to be married, even while it makes that institution available virtually without restriction to all heterosexual citizens of lawful age.  Time and time again, the Supreme Court has recognized and affirmed the fundamental right to marry.  "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving v. Virginia*, 388 U.S. 1, 12 (1967).  It is "the most important relation in life" and of "fundamental importance for all individuals." *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978).  Because of its importance and fundamental nature, "[c]hoices about marriage" are "sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (internal quotation marks omitted).

---

[1]  The statutes include Tex. Fam. Code § 2.001 and Tex. Fam. Code § 6.204.

1

Section 32 infringes on the fundamental due process right to marry, which is "central to personal dignity and autonomy" and "central to the liberty protected by the Fourteenth Amendment.'" *Lawrence v. Texas*, 539 U.S. 558, 574 (2003) (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992)). "Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do." *Id.* Preventing same-sex couples in Texas from marrying and refusing to recognize same-sex marriages performed in other states violates due process by denying Texan same-sex couples, like Plaintiffs, the autonomy and liberty that the Constitution guarantees them.

Section 32 also violates the basic rule of equal protection that "the Constitution 'neither knows nor tolerates classes among citizens.'" *Romer v. Evans*, 517 U.S. 620, 623 (1996) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). As the Supreme Court recently recognized, restricting the rights, benefits, and responsibilities of marriage to opposite-sex couples only "demeans the [same-sex] couple, whose moral and sexual choices the Constitution protects." *United States v. Windsor*, 133 S. Ct. 2675, 2694 (2013) (citing *Lawrence*, 539 U.S. at 588). The Constitution prohibits laws that "impose a disadvantage, a separate status, and so a stigma upon" gay men and lesbians. *Id.*; *see Lawrence*, 539 U.S. at 574 (2003); *Romer*, 517 U.S. at 635.

Just as the judicial branch protected the fundamental right to marry and established that discriminatory laws could not prevent mixed-race couples from exercising that right, the courts again must step in, protect the marriage right, and establish that Section 32 is unconstitutional. This Court should follow the Supreme Court's lead in *Windsor*, *Lawrence*, *Romer*, *Loving*, and so many other cases that have enshrined the right to marry as a fundamental right and recognize

that governments must give all of its citizens' choice of spouses the "same status and dignity" regardless of whether they are same- or opposite-sex. *Windsor*, 133 S. Ct. at 2689.

Unless this Court takes immediate action, Plaintiffs and others like them will continue to suffer irreparable harm—not in some theoretical sense, but in real human terms. This morning, Plaintiffs woke up in a world unimaginable to the majority of citizens, a world in which Plaintiffs are denied equal rights, and thus deemed inferior, because of their sexual orientation—a characteristic as immutable as their sex, their skin color, or their nationality. Today, children of same-sex parents attended school and suffered the stigma that their parents are not permitted to wed, that they are the product of relationships between citizens the state deems unworthy and inferior, and they will wear that badge of inferiority to bed tonight. Today, or perhaps tomorrow, someone in a long-term committed same-sex relationship will die without ever having been married to the person he or she loves, or without having their marriage recognized by the State of Texas.

There is no order this Court can enter at some later date that will heal the wounds inflicted today, or restore the status deprived today, or repair the harm already incurred today. But if this Court determines that Plaintiffs are likely to prevail on the merits of their claims—as it should, as it must—then the Court must afford preliminary relief as soon as practicable and forestall the harm that is certain to occur tomorrow, and the next day, and the day after that. This Court is uniquely charged to afford these Plaintiffs relief. "Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are non-conforming victims of prejudice and public excitement." *Chambers v. Florida*, 309 U.S. 227, 241 (1940).

204156357 v8

Defendants are likely to come forth with justifications for this inequitable law that are not only unfounded, but transparently false.  There exist many sound, beneficial purposes to marriage, but all of them apply with equal force to same-sex unions, and none of them are undermined by permitting citizens of the same sex to marry.  Strip away the fictions and pretext surrounding Section 32, and it becomes clear that Section 32 is law only because there are votes and political power to be won by fomenting fear and prejudice at an unpopular minority.

Treating all citizens equally under the law is not merely an aspiration but a constitutional dictate.  If morality is to be our guide, as Defendants may argue, let it be that fine quality of morality enshrined in the Constitution, which requires that we treat all citizens with equal dignity and respect under the law.  It is the ingenious character of the Constitution that this equal protection serves to permit members of minority groups to become full participants in society, so that their talents and skills may be harnessed for the greater good.  Denying gay and lesbian citizens of Texas an equal right to marry signifies that they are inferior to other citizens.  This not only gives the green light to those who would exclude, mistreat, and demean them based on their sexual orientation, but it perpetuates such discrimination.  Unless and until this Court protects Texas' gay and lesbian citizens, the history of discrimination and prejudice will continue unabated.

Accordingly, this Court should find: (1) that Plaintiffs have established a likelihood of success on the merits, i.e., that Section 32 is unconstitutional; and (2) Plaintiffs are irreparably harmed by Texas' refusal to permit them to marry or have their out-of-state marriages recognized.  The Court should therefore award Plaintiffs injunctive relief and immediately enjoin enforcement of Section 32.

204156357 v8

## FACTUAL BACKGROUND

I.      **Plaintiffs' Background**

        A.      **De Leon and Dimetman Are Lawfully Married and Proud Parents.**

De Leon and Dimetman have been in a committed relationship since they met in 2001. Ex. 1, Decl. of Cleopatra De Leon in Supp. of Pls' Mot. for Prelim. Inj. ("De Leon Decl.") ¶¶ 1,3; Ex. 2, Decl. of Nicole Dimetman in Supp. of Pls' Mot. for Prelim. Inj.  ("Dimetman Decl.") ¶¶ 1-2.  De Leon is a United States Air Force veteran; she was on active duty for four years and served six years in the Texas Air National Guard.  De Leon Decl. ¶ 2; Dimetman Decl. ¶ 1.  She was honorably discharged after ten years of service.  De Leon Decl. ¶ 2; Dimetman Decl. ¶ 1.  At the time she met Dimetman, De Leon was serving in the Texas Air National Guard, while also working as a statistical analyst.  De Leon Decl. ¶ 2; Dimetman Decl. ¶ 1.  Dimetman was running her own business.  De Leon Decl. ¶ 1; Dimetman Decl. ¶ 1.

As a couple, De Leon and Dimetman have supported one another as they pursued further education.  De Leon Decl. ¶¶ 3-5; Dimetman Decl. ¶¶ 2-4.  During their time together, De Leon attended and completed graduate school, while Dimetman went to law school and became an attorney.  De Leon Decl. ¶¶ 4-5; Dimetman Decl. ¶¶ 3-4.  De Leon and Dimetman continue to share finances, live together, and have a loving, stable relationship.  De Leon Decl. ¶ 3; Dimetman Decl. ¶ 2.

De Leon and Dimetman wanted to marry one another in Texas, but Section 32 prevented them from doing so.  De Leon Decl. ¶ 6; Dimetman Decl. ¶ 5.  They therefore chose to marry in a state that recognized same-sex marriage.  De Leon Decl. ¶ 6; Dimetman Decl. ¶ 5.  They traveled to Boston, Massachusetts, where they married on September 11, 2009.  De Leon Decl. ¶ 6; Dimetman Decl. ¶ 5.

De Leon and Dimetman are parents to their child, C.  De Leon Decl. ¶ 7; Dimetman Decl.

¶ 6.  Both De Leon and Dimetman share child-rearing duties and obligations, and each considers

herself C's mother.  De Leon Decl. ¶ 7; Dimetman Decl. ¶ 6.  De Leon is C's biological mother.

De Leon Decl. ¶ 7; Dimetman Decl. ¶ 6.  Because Texas law does not recognize same-sex

marriage, Dimetman could not be considered C's parent automatically.  Therefore, to obtain

recognition as C's parent, Dimetman formally adopted C, at considerable expense.  De Leon

Decl. ¶ 7; Dimetman Decl. ¶ 6.

### B.     Holmes and Phariss Have Been Together More Than 16 Years and Want To Marry One Another.

Holmes and Phariss met in the spring of 1997.  Ex. 3, Decl. of Victor Holmes in Supp. of

Pls' Mot. for Prelim. Inj.  ("Holmes Decl.") ¶ 1; Ex. 4, Decl. of Mark Phariss in Supp. of Pls'

Mot. for Prelim. Inj. ("Phariss Decl.") ¶ 1.  At the time, Holmes was in the Air Force and

stationed in San Antonio.  Holmes Decl. ¶ 1; Phariss Decl. ¶ 1.  Phariss was and remains an

attorney licensed to practice law in Texas.  Holmes Decl. ¶ 1; Phariss Decl. ¶ 1.  They quickly

developed a friendship that blossomed into a dating relationship.  Holmes Decl. ¶ 2; Phariss

Decl. ¶ 2.  On August 9, 1997, they went on their first date, and they celebrate August 9 as their

anniversary.  Holmes Decl. ¶ 1; Phariss Decl. ¶ 2.

After dating for several months, Holmes and Phariss started living together.  While living

together, Holmes, who had joined the Air Force when he was eighteen, began a military program

to become a physician's assistant.  Holmes Decl. ¶ 3; Phariss Decl. ¶ 3.  Upon completing the

program, the Air Force stationed Holmes at different bases throughout the country.  Because

Phariss continued to live and work in Texas, he and Holmes spent the next eleven years in a

long-distance relationship.  Holmes Decl. ¶ 4; Phariss Decl. ¶ 4.  Depending on where Holmes

was serving, Phariss and Holmes would travel as often as every week to every few weeks to see

each other.  Holmes Decl. ¶ 4; Phariss Decl. ¶ 4.  During Holmes' final assignment, at Sheppard

Air Force base in Wichita Falls, Texas, Holmes and Phariss generally saw one another each

weekend and on special occasions during the week.  Holmes Decl. ¶ 4; Phariss Decl. ¶ 4.

Holmes honorably served our nation for nearly twenty-three years and retired as a Major

at the end of 2010.  Holmes Decl. ¶ 5; Phariss Decl. ¶ 5.  After enduring an eleven-year long-

distance relationship, Holmes and Phariss were able to live together again.  Holmes Decl. ¶ 5;

Phariss Decl. ¶ 5.

Holmes and Phariss want to get married.  Holmes Decl. ¶ 6; Phariss Decl. ¶ 6.  On

October 3, 2013, they applied for a marriage license from the Bexar County Clerk Defendant

Rickhoff's office, but Defendant Rickhoff refused to issue one because Holmes and Phariss are

both men.  Holmes Decl. ¶ 6; Phariss Decl. ¶ 6.

## II.    Texas' Constitution and Statutes Unconstitutionally Ban Same-Sex Marriage.

### A.    The Texas Legislature Banned Same-Sex Marriage in 1997 And Broadened the Ban By Enacting Texas' Defense of Marriage Act in 2003.

Texas Family Code § 2.001, enacted in its current form in 1997, prohibits the county

clerk of any Texas county from issuing a license for the marriage of persons of the same sex.

In 2003, the Texas Legislature further amended the Texas Family Code to add § 6.204,

which, among other things, prohibits recognition in Texas of lawful same-sex marriages from

other jurisdictions.  Ex. 11, S.B. 7, 78th Leg., Reg. Sess. (Tex. 2003); Ex. 12, H.B. 38, 78th Leg.,

Reg. Sess. (Tex. 2003).  Section 6.204 declares void all marriages between persons of the same

sex and all civil unions.  Tex. Fam. Code § 6.204(b).  Section 6.204 also prohibits the state and

any of its agencies and political subdivisions from giving effect to any:

> (1)  public act, record, or judicial proceeding that creates,
> recognizes, or validates a marriage between persons of the same
> sex or a civil union in this state or in any other jurisdiction;  or

> (2) right or claim to any legal protection, benefit, or responsibility asserted as a result of a marriage between persons of the same sex or a civil union in this state or in any other jurisdiction.

Tex. Fam. Code § 6.204(c).

> Supporters of § 6.204 claimed:

> > The procreative marriage relationship between a man and a woman is a fundamental institution whose purpose is the propagation of the species in humanity's collective interest. The state has an interest in protecting this relationship, because it gives women and children the surest protection against poverty and abuse, provides for the healthy psychological development of children, and avoids health risks of same-sex relations and promiscuity. The state's recognition of same-sex marriages would undermine the institution of marriage and society's ability to transmit its values to younger generations.

Ex. 13, House Research Org., Report on Major Issues, 78th Leg., Reg. Sess., at 83 (Tex. 2003).

In addition to the grounds cited in the legislative report, supporters of the bill also claimed it was necessary to prohibit the recognition of out-of-state civil unions because recognizing civil unions: (1) "would create a new class of children without mothers or fathers" that "would increase costs to corporations and governmental entities" because a family headed by same-sex parents could not fulfill the children's needs; (2) "could lead to the recognition of bigamy, voluntary incest, pedophilia, and group marriage" and (3) " [i]f the state does not draw the line here, it would be difficult to draw anywhere." Ex. 14, House Research Org., Daily Floor Report, 78th Leg., Reg. Sess., at 27-29 (Tex. April 29, 2003).

As Representative Chisum, one of the sponsors of the legislation, stated: "***This bill does discriminate***. It allows only for a man and a woman to be married in this state and to be recognized as married in this state. This bill does discriminate against any other kind of marriage." Ex. 15, Rachel Stone, *Same-Sex Marriage Ban Goes to Perry; Governor Expected to*

8

*Sign Bill that Got Only 9 'No' Votes in House*, San Antonio Express-News, May 1, 2003, at 6A (emphasis added).

**B.      After Twice Banning Same-Sex Marriage In Its Statutes, Texas Added A Constitutional Amendment Banning Same-Sex Marriage.**

Article I, section 32 of the Texas Constitution began as H.J.R. 6, which proposed to amend the Texas Constitution to define marriage to "consist only of the union of one man and one woman." Ex. 16, H.J.R. 6, 79th Leg., Reg. Sess. (Tex. 2005). On April 25, 2005, subdivision (b) was added to H.J.R. 6, which would expressly bar the state and any political subdivision thereof from creating or recognizing any legal status identical or similar to marriage. Ex. 56, House Journal, 79th Leg., Reg. Sess., at 2202 (Tex. Apr. 25, 2005).

The legislative history of H.J.R. 6 shows that the amendment was supported by the same purported purposes as § 6.204. The primary argument in support of H.J.R. 6 was:

> [T]raditional marriage consisting of a man and a woman is the basis for a healthy, successful, stable environment for children. It is the surest way for a family to enjoy good health, avoid poverty, and contribute to their community. The sanctity of marriage is fundamental to the strength of Texas' families, and the state should ensure that no court decision could undermine this fundamental value.

Ex. 17, House Research Org., Bill Analysis, 79th Leg., Reg. Sess., at 3-4 (Tex. 2005). Not only did the authors of the amendment draft the amendment to preclude same-sex couples from marrying, but they also drafted it to preclude any "separate but equal" status, such as civil unions. According to supporters of the amendment, "[t]his constitutional provision also would protect the definition of marriage by ensuring that civil unions were not permitted in the future. Civil unions are a way for same-sex couples to circumvent laws protecting marriage by creating a legal arrangement that is substantially the same as marriage in all but the name." Ex. 18,

House Research Org., Focus Report on Amendments Proposed for the 2005 Ballot, 79th Leg., Reg. Sess., at 9 (Tex. 2005).

Following votes in both houses of the Texas legislature, H.J.R. 6 passed. Under Texas law, the governor's approval is not necessary to put a proposed constitutional amendment on the ballot. *See* Tex. Const. art. 17, § 1(a). Nevertheless, in early June 2005 Governor Perry ceremonially signed the proposed constitutional amendment at the Calvary Christian Academy in Fort Worth. Ex. 19, Jessica Leeder, *Parental Consent Bill Signed into Law: Ceremony at Christian School in Fort Worth Draws 250 Protesters*, Dallas Morning News, June 6, 2005, at 1A. After doing so, a reporter asked Perry what he would say to gay and lesbian military veterans who wanted to live in Texas. His response: "Texas has made a decision on marriage, and if there's a state with more lenient views than Texas, then maybe that's where they should live." Ex. 10, R.A. Dyer, *Gay-rights group demands apology*, Fort Worth Star-Telegram, June 10, 2005, at B5. In short, those denied equal protection under the laws of the State of Texas by virtue of Proposition 2 should "self-deport" to a state where they may enjoy their constitutional rights.

After approval by Texas' legislature and Defendant Perry's unnecessary approval, H.J.R. 6 was on the ballot in 2005 as Proposition 2. Proposition 2 passed with approximately 76% of the vote. *See* Ex. 20, Janet Elliott, *Gay Marriage Ban Put in Texas Constitution*, Houston Chronicle, Nov. 9, 2005, at A1; Ex. 48, Office of the Texas Secretary of State, Race Summary Report, 2005 Constitutional amendment Election (Nov. 8, 2005). As a result, Article 1 (the Bill of Rights) of the Texas Constitution included a new Section 32:

> (a)  Marriage in this state shall consist only of the union of one man and one woman.
>
> (b)  This state or a political subdivision of this state may not create or recognize any legal status identical or similar to marriage.

10

Tex. Const. art. 1, sec. 32.

### III.   Defendants Are Responsible For Enforcing Texas's Marriage Prohibition.

Defendants Rick Perry and Greg Abbott are the Governor and Attorney General of the State of Texas, and they are responsible for executing and defending the laws and the Constitution of the State of Texas. Tex. Const. art. 16, sec. 1.

Defendant Gerard Rickhoff is the County Clerk of Bexar County, Texas, which is the county where Holmes and Phariss sought a marriage license. Under Texas law, a County Clerk, must provide marriage applications, issue marriage licenses, and determine whether individuals meet the requirements for marriage. Tex. Fam. Code §§ 2.001(a), 2.002, 2.004(a), 2.005, 2.008.

Defendant David Lakey is the commissioner of the Texas Department of State Health Services, which includes the bureau of vital statistics. Tex. Health & Safety Code § 191.002. Lakey, through the bureau of vital statistics, is responsible for prescribing and furnishing to local clerks' offices the marriage forms that require applicants to list a "bride" and a "groom." Tex. Health & Safety Code § 194.0011(a); Tex. Fam. Code § 2.004.

### IV.   Section 32 Causes Numerous Harms To Plaintiffs And All Similarly Situated Same-Sex Couples.

#### A.   Plaintiffs' Inability To Marry Affects Numerous Federal Protections, Benefits, And Obligations.

Texas' refusal to permit Plaintiffs to marry or recognize their out-of-state marriage deprives Plaintiffs of numerous federal protections, benefits, and obligations that are available to married same-sex couples. *See Windsor*, 133 S. Ct. at 2683 (noting that over 1,000 federal laws address marital or spousal status). These federal rights include, among others, having the same rights as heterosexual married couples in one another's Social Security benefits, 42 U.S.C. § 416, seeking protections under the Family and Medical Leave Act, 29 U.S.C. § 2612, and federal Medicaid benefits.

11

Same-sex couples residing in Texas cannot rely upon an out-of-state marriage to confer federal protections, benefits, and obligations. Texas same-sex couples who marry in another state must contend with substantial uncertainty regarding whether the federal government will recognize their marriage for all purposes. For instance, while the Internal Revenue Service recently adopted a "state of celebration" rule in recognizing same-sex marriages, Ex. 21, Rev. Ruling 2013-17, at 9 (Aug. 30, 2013), it is unclear what federal agencies will enact similar rules. Indeed, the Department of Labor recently announced that the Family Medical Leave Act applies only to same-sex couples that reside in states recognizing their marriage. *See* Ex. 22, Dept. of Labor, Fact Sheet #28F: Qualifying Reasons for Leave under the Family and Medical Leave Act (Aug. 2013).

Section 32 and the corresponding statutes similarly operate to deny certain benefits to gay and lesbian service members. In an August 30, 2013 letter to military personnel at state-run installations, Texas Military Forces[2] were directed to deny same-sex couples enrollment access to federal healthcare and retirement benefits at Texas-based National Guard facilities. *See* Ex. 23, Chris Tomlinson, *Texas National Guard Commander Asks for Legal Opinion on Same Sex Military Benefits*, Tyler Morning Telegraph (Sept. 6, 2013); Ex. 24, Josh Hicks, *Texas National Guard Denies Benefits for Same-Sex Spouses*, The Washington Post (September 4, 2013). Instead, these service members and their families must travel to federal installations elsewhere in the state to enroll and obtain access to standard military benefits. In response, United States Secretary of Defense Chuck Hagel reprimanded Texas and the Texas National Guard for failing to grant full spousal benefits to the partners of gay and lesbian members of the armed forces. Ex.

---

[2] The Texas Military Forces comprises the Texas Army National Guard, the Texas Air National Guard, and the Texas State Guard.

25, Chuck Hagel, Secretary of Defense, Remarks at the Anti-Defamation League's Centennial

Dinner (Oct. 31, 2013). "Not only does this violate the states' obligations under federal law, but

their actions have created hardships and inequality by forcing couples to travel long distances to

federal military bases to obtain the ID cards they're entitled to." *Id.*

**B.     Plaintiffs' Inability To Marry Affects Numerous State-Law Protections,
         Benefits, And Obligations.**

Texas' refusal to marry or recognize Plaintiffs' marriage also denies Plaintiffs many state-

law benefits.  Among other things, Plaintiffs cannot:

- Claim statutory protections afforded married couples upon the death of a spouse, such as intestacy rights.  Tex. Probate Code §§ 38, 45.

- Bring an action for wrongful death.  Tex. Civ. Prac. & Rem. Code § 71.004.

- Claim certain protections against the partition of the homestead following the death of a spouse.  Tex. Const. art. 16, sec. 52.

- Receive the community property presumption afforded to married couples.  Tex. Fam. Code § 3.003.

- Petition the court for an equitable division of community property, including rights in any pension or retirement plan.  Tex. Fam. Code §§ 7.001, 7.003.

- Seek spousal maintenance if they separate or divorce.  Tex. Fam. Code § 8.051.

- Have the automatic right to make health care decisions for one another when necessary;

- Have the right to make burial decisions or other decisions regarding the handling and disposition of one another's remains.

- Enjoy succession rights under state laws of intestacy.  Tex. Probate Code § 45.

- Enjoy the benefit of the "zone of privacy" that heterosexual married couples enjoy in the form of evidentiary privileges between spouses.  Tex. R. Evid. 504.

Neither the Texas Fair Housing Act nor the Texas Labor Code prohibits discrimination

based on sexual orientation.  Tex. Prop. Code §§ 301.021, 301.026; Tex. Labor Code §§ 21.051-

053.

204156357 v8

## ARGUMENT

Courts consider four factors to determine if a preliminary injunction is proper. First, the party seeking the preliminary injunction must show a substantial likelihood of success on the merits. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F. 2d 328, 332 (5th Cir. 1981). Second, there must be "a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted." *Id.* Third, the injury the plaintiff may suffer must outweigh the potential harm, if any, that the injunction will cause the defendant. *Id.* Finally, the preliminary injunction must not disserve the public interest. *Id.* Plaintiffs satisfy each of these requirements, and the Court should issue a preliminary injunction enjoining Defendants from enforcing Section 32.

Below, Plaintiffs first demonstrate they have a substantial likelihood of success on the merits by showing that Section 32 violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. Plaintiffs then show that they have satisfied the remaining requirements for a preliminary injunction.

## I.      The Refusal To Marry Same Sex Couples Violates Due Process And Equal Protection Under The United States Constitution.

Section 32 is unconstitutional. <u>First</u>, Section 32's prohibition of same-sex marriages deprives Plaintiffs Holmes and Phariss of due process in violation of the Due Process Clause of the Fourteenth Amendment. <u>Second</u>, Section 32's prohibition of same-sex marriage deprives Plaintiffs Holmes and Phariss of equal protection, violating the Equal Protection Clause of the Fourteenth Amendment. <u>Third</u>, although the Court should apply heightened scrutiny, Section 32 fails even the more-lenient rational basis inquiry. Defendants simply have no rational basis to support Section 32 and, as the evidence shows, the bases offered in the past fail. <u>Fourth</u>, Section 32's refusal to recognize legal out-of-state marriages violates Plaintiffs De Leon's and

14

Dimetman's Fourteenth Amendment due process and equal protection rights.  <u>Finally</u>, *Baker v. Nelson* is not precedential because subsequent cases undermine its reasoning.

### A.    The Denial Of The Right To Marry Deprives Plaintiffs Holmes And Phariss Of Due Process.

The right to marry is a fundamental right protected by the United States Constitution. *E.g.*, *Zablocki*, 434 U.S. at 384 ("[D]ecisions of this Court confirm that the right to marry is of fundamental importance for all individuals."); *Loving*, 388 U.S. at 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.").  The Court has founded the right to marry in privacy, *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965); liberty, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); and association, *M.L.B.*, 519 U.S. at 116.  "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." *Griswold*, 381 U.S. at 486. This fundamental right entails the ability to marry the partner of one's choosing.  *See generally Loving*, 388 U.S. at 12 (due process is violated by denial of right to marry a person of another race).

Most recently, the Supreme Court recognized that marriage involves one of "the most intimate and personal choices a person may make in a lifetime. . . ." *Lawrence*, 539 U.S. at 574 (quoting *Casey*, 505 U.S. at 851).  The right to marry is "'central to personal dignity and autonomy . . . central to the liberty protected by the Fourteenth Amendment.'" *Id.* (quoting *Casey*, 505 U.S. 833).  And *Lawrence* recognized that "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do." *Id.*

Denying homosexuals the right to marry and to select the partners of their choosing violates due process in the same fashion as the anti-miscegenation laws struck down in *Loving*. Holmes and Phariss seek to exercise the right to marry the partner of their choosing, just as the

204156357 v8

plaintiffs in *Loving* did, despite the State's purported moral disdain for their choice of partner. However, that the State may prefer to elevate one type of marriage over another does not permit it to deny each citizen the "freedom of personal choice" in deciding whom to marry, nor may it deny each citizen's decision the "same status and dignity." *Windsor*, 133 S. Ct. at 2689.

By denying Holmes and Phariss the fundamental right to marry, Texas denies their relationship the same status and dignity afforded citizens who are permitted to marry. It also denies them the benefits of marriage—legal, social, and financial— that opposite-sex couples enjoy. As the Supreme Court recently recognized, a state's "definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the protection of offspring, property interests, and the enforcement of marital responsibilities." *Id.* at 2691 (internal quotation marks omitted); *see also Turner v. Safley*, 482 U.S. 78, 96 (1987) ("[M]arital status often is a precondition to the receipt of government benefits (e.g., Social Security benefits), property rights (e.g., tenancy by the entirety, inheritance rights), and other, less tangible benefits (e.g., legitimation of children born out of wedlock)."); *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 11 (1st Cir. 2012) ("Loss of survivor's social security, spouse-based medical care and tax benefits are major detriments on any reckoning; provision for retirement and medical care are, in practice, the main components of the social safety net for vast numbers of Americans.").

By categorically denying the right to marry to a class of citizens, Section 32 "interfere[s] directly and substantially with the right to marry" and can withstand constitutional challenge only if it survives strict scrutiny. *See Zablocki*, 434 U.S. at 386-87 (applying strict scrutiny because statute that prevented non-custodial parents from marrying unless they provided proof of compliance with child support obligations or obtained a court order would prevent some in the

16

affected class of people from ever marrying and would seriously intrude on the ability of those who could comply).  Section 32 survives strict scrutiny and is constitutional only if "it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."  *See id.* at 388; *Carey v. Population Servs. Int'l*, 431 U.S. 678, 686 (1977).

As discussed below (Argument, Section I.C.), Defendants cannot satisfy their burden of proving that Section 32 is constitutional.[3]  They cannot identify any compelling state interest that is served by denying same-sex couples the fundamental right to marry and even if they could, any such interest could be served through less restrictive measures than a total ban on same-sex marriages.

**B.      The Denial Of The Right To Marry Deprives Plaintiffs Holmes And Phariss Of Equal Protection.**

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  By refusing to permit a same-sex couple like Holmes and Phariss to marry, Section 32 "demeans the couple, whose moral and sexual choices the Constitution protects."  *Windsor*, 133 S. Ct. at 2694 (citing *Lawrence*, 539 U.S. at 588).  As with the federal law before the Supreme Court in *Windsor*, Section 32 identifies a "subset" of relationships (same-sex relationships) for which Texas denies the same equal rights, responsibilities, and benefits that opposite-sex couples receive in their right to marry.  Thus, Section 32 is squarely subject to equal protection scrutiny under the federal and Texas Constitutions.

---

[3]  The individual defendants are properly defendants in this case under 42 U.S.C. § 1983, as they were acting under color of state law at all relevant times.

17

1.    <u>Texas' Same-Sex Marriage Ban Should Be Subject To Heightened Scrutiny.</u>

Not every equal protection challenge is subject to the same test.  The Supreme Court has recognized that the "promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer*, 517 U.S. at 631 (citing *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 271-72 (1979)).  However, the Supreme Court consistently applies heightened scrutiny to laws that discriminate against a group that it considers a suspect or quasi-suspect classification, i.e., one that has experienced a "history of purposeful unequal treatment or [has] been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam) (internal quotation marks omitted); *see also Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294 (D. Conn. 2012) (finding statutory classifications based on sexual orientation are entitled to heightened scrutiny); *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 314-333 (N.D. Cal. 2012) (same).  In addition to looking to the history of discrimination, courts also consider whether the characteristics that distinguish the class indicate a typical class member's ability to contribute to society, *Cleburne*, 473 U.S. at 440-441; whether the distinguishing characteristic is "immutable" or beyond the group member's control, *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); and whether the group is "a minority or politically powerless," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (internal quotation marks omitted).

Although gay men and lesbians fulfill all four factors supporting heightened scrutiny, no single factor is dispositive. *Murgia*, 427 U.S. at 321.  The presence of any of the factors is a signal that the particular classification is "more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective," thus triggering

18

heightened scrutiny.  *Plyler*, 457 U.S. at 216 n. 14; *see, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995) (holding that all racial classifications are inherently suspect, even though many racial groups exercise substantial political power).  Such classifications are "treated as presumptively invidious" and must be "precisely tailored to serve a compelling government interest" to pass constitutional muster.  *Plyler*, 457 U.S. at 216.

        a.    <u>Heightened Scrutiny Applies Because Gays and Lesbians Suffer a Long History of Discrimination.</u>

For centuries, the prevailing attitude toward gays and lesbians has been "one of strong disapproval, frequent ostracism, social and legal discrimination, and at times ferocious punishment."  Ex. 26, Richard A. Posner, Sex and Reason 291 (1992); *see also* Ex. 27, Evan Gerstmann, The Constitutional Underclass: Gays, Lesbians, and the Failure of Class-Based Equal Protection 62-66 (1999) (cataloguing the "numerous legal disadvantages" suffered by gay men and lesbians "in twentieth-century America").  Gay men and lesbians have been denied employment, targeted for violence, publicly humiliated, and treated as perverts, sinners, and criminals.  *See* Ex. 28, American Psychological Association, *Answers to Your Questions For A Better Understanding of Sexual Orientation & Homosexuality* (2008) ("Lesbian, gay, and bisexual people in the United States encounter extensive prejudice, discrimination, and violence because of their sexual orientation.  Intense prejudice against lesbians, gay men, and bisexual people was widespread throughout much of the 20th century."); Ex. 29, FBI, *Hate Crime Statistics 2011*, http://www.fbi.gov/about-us/cjis/ucr/hate-crime/2011/tables/table-1 (showing that, after racial minorities, gays and lesbians are the most frequent victims of hate crimes).

Federal courts have agreed.  "[F]or centuries there have been powerful voices to condemn homosexual conduct as immoral."  *Lawrence*, 539 U.S. at 571; *High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 573 (9th Cir. 1990) ("[H]omosexuals have suffered a

204156357 v8

history of discrimination."); *Ben-Shalom v. Marsh*, 881 F.2d 454, 465-66 (7th Cir. 1989)

("Homosexuals have suffered a history of discrimination and still do, though possibly now in

less degree."). Several recent decisions have recounted this long history of discrimination. *See,*

*e.g.*, *Pedersen*, 881 F. Supp. 2d at 314-15; *Golinski*, 824 F. Supp. 2d at 985-86; *Perry v.*

*Schwarzenegger*, 704 F. Supp. 2d 921, 981-91 (N.D. Cal. 2010), *aff'd*, 671 F.3d 1052 (9th Cir.

2012), *rev'd on other grounds*, 133 S. Ct. 2652 (holding that appellants lacked standing to appeal

district court's decision).

      Through much of the twentieth century, homosexuality was characterized by the medical

establishment as a "disease," "mental defect," "disorder," or "degeneration." Such medical

pronouncements provided "a powerful source of legitimation to anti-homosexual sentiment,

much as medical science had previously legitimized widely held (and subsequently discarded)

beliefs about male superiority and white racial superiority." Ex. 30, George Chauncey, Why

Marriage? The History Shaping Today's Debate Over Gay Equality 17 (2004). Indeed, the Fifth

Circuit has observed that "the strong objection to homosexual conduct … has prevailed in

Western culture for the past seven centuries." *Baker v. Wade*, 769 F.2d 289, 292 (5th Cir. 1985).

Homosexual conduct was a criminal offense in many state laws until the Supreme Court struck

down those laws in *Lawrence*. *See id.*; *see also Bowers v. Hardwick*, 478 U.S. 186, 192 (1986),

*overruled, Lawrence*, 539 U.S. 558.

      Federal laws also institutionalized discrimination against gays and lesbians. The military

formally barred gays and lesbians from serving in World War II. Ex. 31, Nathaniel Frank,

Unfriendly Fire: How the Gay Ban Undermines the Military and Weakens America 9 (2009).

During the 1950s, President Eisenhower issued an executive order requiring the discharge of

homosexual employees, among others, from all federal employment. Ex. 32, Exec. Order No.

10450, 18 Fed. Reg. 2489 (1953).  A Senate subcommittee investigated the "problem" of government-employed homosexuals and determined that "homosexuals and other sex perverts are not proper persons to be employed in Government for two reasons; first, they are generally unsuitable, and second, they constitute security risks."  Ex. 33, S. Doc. No. 241, Employment of Homosexuals and Other Sex Perverts in Government, 81st Congress, at 3 (1950).  The federal government's employment discrimination against gay men and lesbians continued until the late 1990s.  *See* Ex. 34, Letter from John W. Macy, Chairman, Civil Service Commission, to the Mattachine Society of Washington (Feb. 25, 1966) (rejecting the Society's request that the federal government rescind its policy against employing homosexuals because of, among other reasons, the "revulsion of other employees" and the "unavoidable subjection of the sexual deviate to erotic stimulation through on-the-job use of the common toilet, shower and living facilities"); Ex. 35, Exec. Order No. 13087, 63 Fed. Reg. 30097 (June 2, 1998) (adding "sexual orientation" to Exec. Order 11478, 34 Fed. Reg. 11478 (Aug. 8, 1969) regarding equal employment opportunity in the federal government).  From 1917 to 1990, Congress prohibited gays and lesbians from entering the country.  Ex. 36, Immigration Act of 1917, Pub. L. No. 64-301, §3, 39 Stat. 874, 875 (1917) (requiring exclusion of "persons of constitutional psychopathic inferiority"); Ex. 37, Immigration and Nationality Act, amended October 3, 1965, Pub. L. No. 89-236, § 15(b), 79 Stat. 911, 919 (amending the Immigration and Nationality Act to add "sexual deviation" as a ground for denying entry into the United States); 8 U.S.C. § 1182(a)(4) (1982) (prohibiting individuals who acknowledged their homosexuality from entering this country); Immigration Act of 1990, Pub. L. No. 101-649, § 601, 104 Stat. 4978, 5067-77 (1990) (finally eliminating "sexual deviants" from the list of excludable aliens).

Discrimination against gays and lesbians is deeply entrenched in Texas.  Although

*Lawrence* struck down as unconstitutional the Texas statute criminalizing sodomy, subsequent

and repeated efforts to repeal the unconstitutional statute have failed.  *See* Ex. 38 (H.B. 3232,

H.B. 1701, and S.B. 538, 83rd Leg., Reg. Sess. (Tex. 2013) (passed out of committee); H.B.

2156 and H.B. 604, 82d Leg., Reg. Sess. (Tex. 2011) (died in committee); H.B. 3026, 81st Leg.,

Reg. Sess. (Tex. 2009) (same); H.B. 1326, 80th Leg., Reg. Sess. (Tex. 2007) (same)).  In Texas,

calling someone a "homosexual," or using a slang word implying the same, has been held to

constitute slander per se because doing so implies that the person has violated a criminal law.

*Thomas v. Bynum*, No. 04-02-00036-CV, 2002 WL 31829509, at *2 (Tex. App. Dec. 18, 2002);

*Head v. Newton*, 596 S.W.2d 209, 210 (Tex. App. 1980).  State law does not prohibit

discrimination against gays and lesbians, and Texas courts have expressly found homosexuality

to be permissible grounds for denying employment.  *City of Dallas v. England*, 846 S.W.2d 957,

958 (Tex. App. 1993); *Childers v. Dallas Police Dep't*, 513 F. Supp. 134 (N.D. Tex. 1981).  In

fact, current Texas law requires that education programs "state that homosexual conduct is not an

acceptable lifestyle and is a criminal offense." Tex. Health & Safety Code § 85.007; *see id.* §

163.002(8).[4]

Indeed, even after *Windsor*, Texas defiantly continues to discriminate against gays and

lesbians serving in the National Guard, by refusing to issue military IDs to same-sex spouses of

service members at National Guard facilities.  This, in the words of the United States Secretary

of Defense, "causes division among the ranks, and it furthers prejudice, which DOD has fought

to extinguish." Ex. 39, American Forces Press Service, *Hagel: States Denying Same-Sex Family*

---

[4] The same bills introduced to repeal Texas Penal Code § 21.06 similarly sought—
unsuccessfully—to remove these provisions from Texas Health and Safety Code.

*Benefits Must Comply.* Apparently, even those whom Texas calls upon to provide emergency aid and to risk their well-being for the sake of fellow Texans are not shielded from Texas' invidious anti-gay discrimination. *See* Ex. 25, Chuck Hagel, Secretary of Defense, Remarks at the Anti-Defamation League's Centennial Dinner (Oct. 31, 2013) ("Whether they are responding to natural disasters here at home, in their states, or fighting in Afghanistan, our National Guardsmen all wear the uniform of the United States of America. They are serving this country. They—and their families—are entitled to the benefits and respect accorded to all of our military men and women.").

        b.      <u>Heightened Scrutiny Applies Because Sexual Orientation Is Not Related to the Ability of Gays and Lesbians to Contribute to Society.</u>

Like other suspect classifications such as race, national origin, and religion, sexual orientation has no "relation to [the] ability" of a person "to perform or contribute to society." *City of Cleburne*, 473 U.S. at 440-41 (citation omitted); *Pedersen*, 881 F. Supp. 2d at 318-19 ("[T]he long-held consensus of the psychological and medical community is that 'homosexuality per se implies no impairment in judgment, stability, reliability or general or social or vocational capabilities.'") (quoting 1973 Resolution of the American Psychological Association); *Perry v. Schwarzenegger*, 704 F. Supp. 2d at 1002 ("[B]y every available metric, opposite-sex couples are not better than their same-sex counterparts, instead, as partners, parents and citizens, opposite-sex couples and same-sex couples are equal."); *see also Watkins v. U.S. Army*, 875 F.2d 699, 725 (9th Cir. 1989) ("Sexual orientation plainly has no relevance to a person's 'ability to perform or contribute to society.'"); *Equality Found. of Greater Cincinnati, Inc. v. Cincinnati*, 860 F. Supp. 417, 437 (S.D. Ohio 1994) ("Sexual orientation ... bears no relation whatsoever to an individual's ability to perform, or to participate in, or contribute to, society .... If homosexuals were afflicted with some sort of impediment to their ability to perform and contribute to society the entire

23

phenomenon of 'staying in the closet' and of 'coming out' would not exist, their impediment would betray their status"), *rev'd on other grounds*, 54 F.3d 261 (6th Cir. 1995), *vacated and remanded*, 518 U.S. 1001 (1996).

Sexual orientation also does not prevent same-sex couples from forming long-lasting and successful relationships. Indeed, "[s]ame-sex couples are identical to opposite-sex couples in the characteristics relevant to the ability to form successful marital unions. Like opposite-sex couples, same-sex couples have happy, satisfying relationships and form deep emotional bonds and strong commitments to their partners." *Perry*, 704 F. Supp. 2d at 967. Gay and lesbian couples also are just as capable of raising well-adjusted children. *Id.* at 980-81 ("Children raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted."). In the field of developmental psychology, "[t]he research supporting this conclusion is accepted beyond serious debate." *Id.* Indeed, numerous scientific, educational, sociological, medical, and pediatric societies recently filed amicus briefs before the Supreme Court attesting that same-sex couples are as capable parents as heterosexual couples. Ex. 40, Amicus Br. for The Am. Psychological Ass'n, et al., at 14-26, *United States v. Windsor*, No. 12-307 (filed Mar. 1, 2013); Ex. 41, Amicus Br. for The Am. Sociological Ass'n, at 6-14, *Hollingsworth v. Perry*, No. 12-144, (filed Feb. 28, 2013).

> c.   <u>Heightened Scrutiny Applies Because Sexual Orientation is Immutable.</u>

A law is more likely to receive heightened scrutiny if it discriminates against an individual based on a characteristic that he or she either cannot realistically change, or ought not to be compelled to change because it is fundamental to his or her identity. *See, e.g.*, *Plyler*, 457 U.S. at 220 (noting that illegal alien children "have little control" over that status); *Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977) (treating resident aliens as a suspect class despite their ability

24

to opt out of that class); *Steffan v. Perry*, 41 F.3d 677, 689 n.9 (D.C. Cir. 1994) (noting that a [c]lassification[] based on ... religion, of course, would trigger strict scrutiny").

Sexual orientation falls within this category of defining personal characteristics. As the Supreme Court acknowledges, sexual orientation is so fundamental to a person's identity that one ought not be forced to choose between one's sexual orientation and one's rights as an individual—even if one could make such a choice. *Lawrence*, 539 U.S. at 576-77 (recognizing that individual decisions by consenting adults concerning the intimacies of their physical relationships are "an integral part of human freedom"). Federal courts have repeatedly recognized that "[s]exual orientation and sexual identity are immutable," *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000); "[s]exual orientation is fundamental to a person's identity," *Perry*, 704 F. Supp. 2d at 964-66; and "[h]omosexuality is as deeply ingrained as heterosexuality," *Hernandez-Montiel*, 225 F.3d at 1093 (internal quotation marks omitted).

The scientific consensus is that sexual orientation is an immutable characteristic. *See, e.g.*, Ex. 42, G.M. Herek, et al. *Demographic, Psychological, and Social Characteristics of Self–Identified Lesbian, Gay, and Bisexual Adults in a U.S. Probability Sample*, 7 Sexuality Res. & Soc. Pol'y 176, 186 and 188 (2010) (noting that in a national survey, 95 percent of gay men and 84 percent of lesbian women reported that they "had little or no choice about their sexual orientation"); *Pedersen*, 881 F. Supp. 2d at 320-21 (finding that the immutability of sexual orientation "is supported by studies which document the prevalence of long-lasting and committed relationships between same-sex couples as an indication of the enduring nature of the characteristic"). Courts that have examined literature and evidence have concluded that sexual orientation is not something that people can change. *E.g.*, *Perry*, 704 F. Supp. 2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision,

25

therapeutic intervention or any other method, change his or her sexual orientation."); *Pedersen*, 881 F. Supp. 2d at 321 (citing reports and statements by American Psychiatric Association, American Psychological Association, American Counseling Association, National Association of Social Workers, and the American Academy of Pediatrics critical of programs that purport to "treat" homosexuals to "change" their sexual orientation). An American Psychological Association task force concluded that therapeutic programs designed to "change" sexual orientation are not only ineffective, but actually harmful. Ex. 43, Am. Psychological Ass'n Task Force on Appropriate Therapeutic Responses to Sexual Orientation, 2009, Report of the Task Force at 2-3.

> d.    Heightened Scrutiny Applies Because Gay Men and Lesbians Lack Political Power to Eliminate Significant Constitutional and Statutory Disadvantages.

Gay and lesbian citizens constitute a minority group that lacks sufficient political power to protect themselves against discriminatory laws. Currently, there are six openly gay or lesbian members of the House of Representatives and one Senator—constituting about one percent of the 535 members of Congress. Ex. 44, Jeremy W. Peters, *Openly Gay, and Openly Welcomed in Congress*, N.Y. Times, January 26, 2013, at A1.

Texas' record of electing openly gay or lesbian lawmakers is even more sparse. In January 2013, Mary Rodriguez became only the second openly gay or lesbian legislator in Texas history. Ex. 45, Zahira Torres, *Gay El Paso rep writes self into Texas Legislature history*, El Paso Times, Jan. 9, 2013. She is the only openly gay or lesbian legislator currently serving among the 150 members of the Texas House. There has never been an openly gay or lesbian member of the Texas Senate.

The history of same-sex marriage bans illustrate the lack of political power possessed by gays and lesbians. Before 1993, only three states expressly restricted marriage to opposite-sex

couples.  Andrew Koppelman, *The Difference the Mini-DOMAs Make*, 38 Loy. U. Chi. L.J. 265

(2007).  By 2006, 40 states had enacted such bans.  *Id.* at 265-66.  Between 1998 and 2006, thirty

states passed constitutional amendments to ban same-sex marriage.  Most recently, North

Carolina passed a constitutional amendment banning same-sex marriage in 2012.  Ex. 46,

Campbell Robertson, *Ban on Gay Marriage Passes in North Carolina*, N.Y. Times, May 9, 2012,

at A15.

        In Texas, H.J.R. 6, the bill that became Article I, § 32, had five authors and 74 co-authors

in the House of Representatives—a legislative body with 150 members.  Ex. 57.  Thus, more

than half of the state's representatives claimed authorship or co-authorship of the discriminatory

same-sex marriage ban, reflecting the legislators' enthusiasm to be seen not just as a proponent

of the law, but as its creator.  H.J.R. 6 passed the House with a vote of 102-29 and the Senate

with a vote of 21-8.  Ex. 47, H.J.R. Res. 6, 79th Leg. (Tex. 2005).  It then was approved as

Proposition 2 by voters by a more than 3-to-1 margin, receiving 76.25% approval.  Ex. 48, Office

of the Texas Secretary of State, Race Summary Report, 2005 Constitutional amendment Election,

(Nov. 8, 2005).  Previously, Family Code § 6.204, which prohibits same-sex marriages and civil

unions, was enacted in 2003 by a vote of 118-9 in the Texas House, and by voice-vote in the

Texas Senate.  Ex. 11, Tex. S.B. 7, 78th Leg., Reg. Sess. (Tex. 2003).

        Moreover, as discussed above, despite the fact that Texas' sodomy law is

unconstitutional, every attempt to repeal it has failed.  It remains on Texas' books to this day, as

does the mandate that students be instructed that homosexual conduct is criminal.

        These facts overwhelmingly demonstrate that gays and lesbians lack substantial political

power, establishing that this factor weighs in favor of applying heightened scrutiny to Section 32.

*See also* Ex. 5, Decl. of Gary M. Segura in Supp. of Pls' Mot. for Prelim. Inj. ¶ 10 ("Gay men

and lesbians do not possess a meaningful degree of political power and are politically

vulnerable."). However, even if the small strides that gays and lesbians have made politically

would suggest they have political power, courts give less weight to this factor than the others.

Indeed, the Supreme Court recognizes women as a quasi-suspect class despite the fact that this

group is neither a minority nor truly politically powerless. *Frontiero v. Richardson*, 411 U.S.

677, 686 n. 17 (1973) (plurality opinion) (acknowledging that women "do not constitute a small

and powerless minority"); *Pedersen*, 881 F. Supp. 2d at 326-27 (recognizing this factor receives

less weight); *see also In re Marriage Cases*, 43 Cal.4th 757, 842-43 (2008) (concluding that

political powerlessness cannot be required for heightened scrutiny to apply because other groups

like women and African Americans continue to be accorded heightened protection although they

no longer lack political power).

> 2.    Past Cases Holding That Equal Protection Challenges By Gays And
>        Lesbians Are Not Subject To Heightened Scrutiny Are Not Controlling.

Defendants may argue that heightened scrutiny should not apply by citing older cases that

have analyzed equal protection claims using the rational basis test. The decisions in these cases

were premised on a foundation that no longer exists. Accordingly, this Court should follow

newer authority like *Golinski* and *Pedersen*, which carefully scrutinized the current legal

landscape in concluding that heightened scrutiny should apply.

The first set of older cases directly held that that equal protection claims by gays and

lesbians were not subject to heightened scrutiny and are only subject to rational basis review.

*See, e.g.*, *High Tech Gays*, 895 F.2d at 571; *Ben–Shalom*, 881 F.2d at 456. However, as *Golinski*

explained, these cases relied on the pre-*Lawrence* decision in *Bowers* that upheld sodomy laws

and permitted the criminalization of homosexual conduct. Consequently, both cases rationalized

that if homosexual conduct could be criminal, it followed that gays and lesbians could not be a

suspect class. *High Tech Gays*, 895 F.2d at 571 (finding that because states could criminalize homosexual conduct, "homosexuals cannot constitute a suspect or quasi-suspect class entitled to greater than rational basis review for equal protection purposes"); *Ben-Shalom*, 881 F.2d at 464 (same). Because the Supreme Court reversed *Bowers* and criminal sodomy laws are unconstitutional, the underlying premise in cases finding that gay men and lesbians are not entitled to heightened scrutiny is no longer apt. *Golinski*, 824 F. Supp. 2d at 984; *Pedersen*, 881 F. Supp. 2d at 312-13.

Two other major reasons exist to reject those older decisions. First, as *Golinski* recognized, *High Tech Gays* relied on the assumption the homosexuality was a behavioral decision, not an immutable characteristic. *Golinski*, 824 F. Supp. 2d at 984 (citing *High Tech Gays*, 895 F.2d at 573-74). As discussed above, that premise is wrong and, under *Lawrence*, not a basis for justifying discriminatory legislation toward gays and lesbians. *Id.* at 984-85; *see also Lawrence*, 539 U.S. at 575.

Second, cases like *High Tech Gays* and *Ben-Shalom* involved challenges to military policy on homosexual conduct, which placed them in an unusual and very different context from the claims here, which arise in civilian context. *Pedersen*, 881 F. Supp. 2d at 312-13. Because "individual rights must of necessity be curtailed" within the military, "courts have applied less stringent standards to constitutional challenges to military rules, regulations and procedures than they have in the civilian context" and consequently a court's "review of military regulations is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Able v. United States,* 155 F.3d 628, 633 (2d Cir. 1998) (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)). For this reason, cases applying a rational-basis review

204156357 v8

in challenges to military policies toward gays and lesbians should not be conclusive in challenges to non-military legislation. *Pedersen*, 881 F. Supp. at 312-13.

Defendants also may rely upon other decisions that apply rational basis review to laws discriminating against gays and lesbians.  Such cases would include *Lawrence*, though it was not decided on equal protection grounds; *Romer*, 517 U.S. 620, which struck down a Colorado constitutional amendment that prohibited the passage of measures designed to prevent discrimination on the basis of sexual orientation; and *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004), a case involving a prisoner's challenge to the manner in which he was housed.  These cases did not hold that gays and lesbians are not a suspect class—they did not reach the issue because the laws failed rational basis review.  *Romer* and *Lawrence* held that the laws in question failed rational-basis review, so there was no need for the Supreme Court to decide whether gays and lesbians were a suspect classification.[5]  The same is true of *Johnson,* which held that the plaintiff stated a claim for an equal protection violation under a rational basis test.  *Johnson*, 385 F.3d at 532.  Because rational basis is the lowest level of constitutional scrutiny, these cases did not require the courts to analyze whether heightened review was appropriate and, thus, they are not dispositive of the issue of whether gays and lesbians are suspect classes in this case.

**C.      Texas' Same Sex Marriage Ban Fails Both Heightened Scrutiny And Rational Basis Examination.**

To survive heightened scrutiny, Defendants must show that Section 32 is narrowly tailored to effectuate an important government objective, *Zablocki*, 434 U.S. at 388, or that Section 32 is "substantially related to an important governmental objective," *Clark v. Jeter*, 486

---

[5] As *Pedersen* points out, "the word 'suspect' does not appear once in the Supreme Court's decision in *Lawrence* and only the dissent in *Romer* mentions suspect class in a footnote noting that respondents elected to not appeal to the Supreme Court of Colorado the trial court's rejection of their argument that homosexuals constitute a suspect or quasi-suspect class." *Pedersen*, 881 F. Supp. 2d at 311.

204156357 v8

U.S. 456, 461 (1988) (applying intermediate scrutiny).  Under this standard, the Court must find

that statutory classification reflects "a reasoned judgment consistent with the ideal of equal

protection by inquiring whether it may be fairly viewed as furthering a substantial interest of the

state." *Plyler*, 457 U.S. at 217-18.  "The justification must be genuine, not hypothesized or

invented post hoc in response to litigation," and it must not rely "on overbroad generalizations."

*United States v. Virginia*, 518 U.S. 515, 533 (1996).  Defendants cannot show that the same-sex

marriage ban satisfies heightened scrutiny.  When the Constitution allows convicted felons to

marry, it is impossible to identify an important government objective served by denying the same

right to law-abiding same-sex couples.  *Turner*, 482 U.S. at 94-96 (holding that prisoners were

entitled to fundamental right to marry).

  The Court need not decide whether Section 32 fails heightened scrutiny because Section

32 cannot even satisfy the more-lenient rational basis test.  *Romer*, 517 U.S. at 631.  To survive

the rational basis test, Section 32 must bear at least some rational relationship to a legitimate

government purpose.  *Id.*; *see City of Cleburne*, 473 U.S. at 446 (holding that even when there is

a legitimate government purpose, the discrimination must bear at least some rational relationship

to that purpose); *Heller v. Doe*, 509 U.S. 312, 321 (1993) (rational basis test requires that the

proffered justification for a law "must find some footing in the realities of the subject addressed

by the legislation").  Thus, courts "insist on knowing the relation between the classification

adopted and the object to be attained."  *Romer*, 517 U.S. at 632.  A law will not survive rational

basis scrutiny unless it is "narrow enough in scope and grounded in a sufficient factual context

for [the court] to ascertain some relation between the classification and the purpose it serve[s]."

*Id.* at 632-33.  "By requiring that the classification bear a rational relationship to an independent

31

and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633.

In prior litigation, Defendants identified two bases for Section 32: (1) "to encourage responsible procreation"; and (2) "to increase the likelihood that children will be raised by a mother and a father in the context of stable, long-term relationships." *See* Br. on the Merits of Resp't the State of Texas, *In the Matter of the Marriage of J.B. and H.B.*, No. 11-0024, at 30 (Tex. Sept. 26, 2011). In other words, the alleged rational basis is "to encourage stable family environments for procreation and the rearing of children by a mother and father." *Id.* at 29. These alleged bases are consistent with the arguments made by Section 32's supporters before the Texas legislature. *See, e.g.*, Ex. 17, House Research Org., Bill Analysis, 79th Leg., Reg. Sess. (Tex. 2005) ("A traditional marriage consisting of a man and a woman is the basis for a healthy, successful, stable environment for children."). These alleged bases do not withstand rational basis scrutiny.[6]

       1.       Rather than Encouraging Stable Environments for Procreation, The Same-Sex Marriage Ban Destabilizes Them.

The notion that the same-sex marriage ban will encourage procreation assumes that heterosexual marriage is "naturally procreative." But procreation is not and never has been a

---

[6] Notably, neither of the alleged bases is "tradition." Tradition cannot, alone, form a rational basis for a law. *Williams v. Illinois*, 399 U.S. 235, 239 (1970); *Perry*, 704 F. Supp. 2d at 998 ("[T]he state must have an interest apart from the fact of the tradition itself."). "[T]he argument that the definition of marriage should remain the same for the definition's sake is a circular argument, not a rational justification." *Golinski*, 824 F. Supp. 2d at 998; *see Romer*, 517 U.S. at 635 (rejecting a law as "classification of persons undertaken for its own sake, something that the Equal Protection Clause does not permit"); *see also Varnum v. Brien*, 763 N.W.2d 862, 898 (Ia. 2009) ("A specific tradition sought to be maintained cannot be an important government objective for equal protection purposes, however, when the tradition is nothing more than the historical classification currently expressed in the statute being challenged."). Moreover, Section 32 is inconsistent with an important marriage tradition—free choice of marriage partner. *See generally* Ex. 6, Decl. of Nancy F. Cott in Supp. of Pls' Mot. for Prelim. Inj. ("Cott Decl.").

qualification for marriage. *Lawrence*, 539 U.S. at 605 (Scalia, J., dissenting) ("[W]hat justification could there possibly be for denying the benefits of marriage to homosexual couples exercising 'the liberty protected by the Constitution'?  Surely not the encouragement of procreation since the sterile and the elderly are allowed to marry."); *Golinski*, 824 F. Supp. 2d at 993 ("The ability to procreate cannot and has never been a precondition to marriage."); Cott Decl. ¶¶ 32-33.

Further, if Texas intended for Section 32 to reserve marriage for couples that can procreate by having sex, then the ban is woefully underinclusive.  Texas does not prevent the marriages of the sterile, the elderly, and those who do not intend to have children.  A marriage's validity does not hinge upon consummation.  These individuals—who cannot or will not procreate—are allowed to marry.  Only same-sex couples are purportedly denied the right to marry on the basis of this biological limitation.  Section 32 makes "no sense in light of how [it] treat[s] other groups similarly situated in relevant respects," and, consequently, "encouraging stable environments for procreating" does not provide a rational basis for Section 32.  *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001); *Goodridge v. Dep't of Public Health*, 798 N.E.2d 941, 962 (Mass. 2003) ("General Laws c. 207 contains no requirement that the applicants for a marriage license attest to their ability or intention to conceive children by coitus.  Fertility is not a condition of marriage, nor is it grounds for divorce.  People who have never consummated their marriage, and never plan to, may be and stay married."); *Baker v. State*, 744 A.2d 864, 881 (Vt. 1999) ("It is equally undisputed that many opposite-sex couples marry for reasons unrelated to procreation, that some of these couples never intended to have children, and that others are incapable of having children.  Therefore, if the purpose of the statutory

exclusion of same-sex couples is to 'further the link between procreation and child rearing,' it is significantly underinclusive.").

But even assuming, arguendo, that heterosexual marriage was "naturally procreative," Texas' logic rests on the notion that permitting same-sex marriage will somehow undermine procreation among heterosexuals. Case law, statistics, and common sense tell us this fear is unfounded. "Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages." *Perry*, 704 F. Supp. at 972. Same sex marriage does not make it more or less likely that heterosexuals will marry and engage in activities that can lead to procreation. *See, e.g.*, *id.* at 999; *Goodridge*, 798 N.E.2d at 962 (stating that there was no evidence "that forbidding marriage to people of the same sex will increase the number of couples choosing to enter into opposite-sex marriages in order to have and raise children"). As the Ninth Circuit aptly put it: "It is implausible to think that denying two men or two women the right to call themselves married could somehow bolster the stability of families headed by one man and one woman." *Perry v. Brown*, 671 F.3d 1052, 1089 (9th Cir 2012), *rev'd on other grounds*, 133 S. Ct. 2652 (2013) (finding that appellees lacked standing to appeal district court's decision).

Statistical evidence supports the case law: same-sex marriage has no effect on heterosexual marriage or divorce rates. Ex. 7, Decl. of Lee Badgett in Supp. of Pls' Mot. for Prelim. Inj. ("Badgett Decl.") ¶¶ 69-77. "[T]here is no evidence to conclude that heterosexual marriage would be discouraged or made unstable if same-sex couples were allowed to marry." *Id.* ¶ 69. Data from the Netherlands, the first country to allow same-sex marriage, and states that have legalized same-sex marriage "show[] that patterns of marriage, divorce, and other indicators are not affected when same-sex couples can marry." *Id.* "An analysis of demographic trends,

34

population-based surveys, and qualitative interviews in the Netherlands shows no evidence that granting the right to marry to same-sex couples will have any effect on heterosexual couples' willingness to marry, their probability of divorce, or the non-marital birth rate." *Id.* ¶ 70. Similarly, "scholars compar[ing] the experience of Massachusetts and other states that allow same-sex couples to marry to the experiences of states that do not allow same-sex couples to marry … find no evidence of any negative effect on measures of heterosexual behavior related to same-sex couples marrying." *Id.* ¶ 69.

The evidence showing that same-sex marriage has no impact on opposite-sex marriage is unsurprising.

> The results of more than a century of anthropological research on households, kinship relationships, and families, across cultures and through time, provide no support for the view that either civilization or viable social orders depend upon marriage as an exclusively heterosexual institution.  Rather, anthropological research supports the conclusion that a vast array of family types, including families built upon same-sex partnerships, can contribute to stable and humane societies.

Ex. 49, Am. Anthropological Ass'n, *Statement on Marriage and the Family* (Feb. 26, 2004). Thus, the argument that allowing same-sex couples to marry will undermine procreation in others is the type of unsupported "overbroad generalization" that cannot be a basis for upholding discriminatory legislation.  *Plyler*, 457 U.S. at 217-18.

In fact, rather than serving the interest of encouraging stable environments for procreation, Section 32 hinders the creation of such environments.  As Plaintiffs De Leon and Dimetman can attest, same-sex couples have children.  *See Windsor*, 133 S. Ct. at 2694 (recognizing that laws prohibiting same-sex marriage "humiliate[] tens of thousands of children now being raised by same-sex couples").  Just like opposite-sex couples and individuals, same-sex couples can have children through assisted reproductive techniques and through adoption.

204156357 v8

*See Golinski*, 824 F. Supp. 2d at 992 ("[S]ame sex parents can and do have and adopt children.");
*Baker*, 744 A.2d at 882 ("[T]he reality today is that increasing numbers of same-sex couples are
employing increasingly efficient assisted-reproductive techniques to conceive and raise
children."). Texas does not prohibit same-sex couples from adopting or using assisted
reproductive techniques. Defendants can offer no justification why Texas permits same-sex
couples to procreate and adopt children outside of wedlock, while simultaneously claiming that
allowing them to marry undermines procreation. In so doing, Section 32 affirmatively de-
stabilizes the environment for same-sex parents to procreate. Thus, Section 32 actually defeats
the very purpose it was supposedly designed to protect.

> 2.  Rather Than Encouraging Stable Environments for Child-Rearing, The
>     Same-Sex Marriage Ban Destabilizes The Environment For All Children
>     of Same-Sex Couples.

The second basis asserted in the prior case—that the same-sex marriage ban encourages
stable environments for child-rearing—is another overbroad generalization devoid of factual
support and common sense. As just discussed, same-sex couples in Texas can conceive and
adopt children. It follows that they, therefore, raise children, just as De Leon and Dimetman are
raising their child, C.

Far from encouraging a stable environment for child rearing, Section 32 denies children
of same-sex parents the protections and stability they would enjoy if their parents could marry.
Ex. 50, Ellen C. Perrin, Benjamin S. Siegel, and the Committee on Psychosocial Aspects of
Child and Family Health, *Promoting the Well-Being of Children Whose Parents Are Gay or
Lesbian*, 131 Pediatrics 1374, 1377 (Apr. 2013) ("Children who are raised by married parents
benefit from the social and legal status that civil marriage conveys to their parents."). It
precludes children of same-sex couples from enjoying the legal protections and emotional
benefits associated with having legally married parents. *See supra*, Factual Background § IV;

*Windsor*, 133 S. Ct. at 2694.  Among other things, without undergoing formal adoption, children of same-sex couples have no legal right to inherit from the non-biological parent and may be denied rights such as hospital visitation if that parent becomes ill.  The non-biological parent may be denied similar visitation rights or the ability to make decisions about the child without the biological parent in connection with legal, medical, or educational matters.  Thus, for same-sex families, Section 32 does not encourage stable environments for child rearing.  *See Perry*, 704 F. Supp. 2d at 1000 (denying same-sex parents the right to marry denies them the benefits, including stability, attendant to marriage).  It does the very opposite; it ensures that children of same-sex parents will never enjoy the benefits that would result from their parents' marriages. *Golinski*, 824 F. Supp. 2d at 992 ("The denial of recognition and withholding of marital benefits to same-sex couples does nothing to support opposite-sex parenting, but rather merely serves to endanger children of same-sex parents."); *Pedersen*, 881 F. Supp. 2d at 336-37 (finding that the denial of marriage to same-sex parents "in fact leads to a significant unintended and untoward consequence by limiting the resources, protections and benefits available to children of same-sex parents"); Ex. 51, Am. Psychiatric Ass'n, *Position Statement on Support of Legal Recognition of Same-Sex Civil Marriage* (July 2005) ("The children of unmarried gay and lesbian parents do not have the same protection that civil marriage affords the children of heterosexual couples.").

Moreover, more than 25 years of research indicates that children and adolescents of same-sex parents "are as successful psychologically, emotionally, and socially as children and adolescents raised by heterosexual parents, including biological parents."  Ex. 8, Decl. of Michael E. Lamb in Supp. of Pls' Mot. for Prelim. Inj. ("Lamb Decl.") ¶ 13; *see also* Ex. 50, Perrin, *supra* at 1377 ("A large body of scientific literature demonstrates that children and adolescents who grow up with gay and/or lesbian parents fare as well in emotional cognitive,

social, and sexual functioning as do children whose parents are heterosexual."). "[T]he concerns often raised about children of lesbian and gay parents—concerns that are generally grounded in prejudice against and stereotypes about gay people—are unfounded." Ex. 28, Am. Psychological Ass'n, *Answers to Your Questions For A Better Understanding of Sexual Orientation & Homosexuality*, at 5. While factors such as poverty, parental depression, parental substance abuse, divorce, and domestic violence confer risk to a child's healthy development, "the sexual orientation of their parents is not among them." Ex. 50, Perrin, *supra* at 1377.

"The parents' sex or sexual orientation does not affect the capacity to be good parents or their children's healthy development." Lamb Decl. ¶ 14. Children do not need a male and female parent—they need parents. *Id.* ¶¶ 14, 28, 31 ("The social science literature overwhelmingly rejects the notion that there is an optimal gender mix of parents or that children and adolescents with same-sex parents suffer any developmental disadvantages compared with those with two different-sex parents."). A child's adjustment depends upon qualities such as "the parents' affection, consistence, reliability, responsiveness, and emotional commitment, as well as on the quality and character of the relationships between the parents and their intimates, and on the availability of sufficient economic and social resources." *Id.* ¶ 21.

Leading medical, psychological, and social-welfare organizations oppose same-sex parenting restrictions because of the abundant scientific evidence showing that children raised by gay and lesbian parents are as likely to be well adjusted as children raised by heterosexual parents. *See* Ex. 52, Am. Acad. of Pediatrics, *Coparent or Second-Parent Adoption by Same-Sex Parents*, Feb. 2002; Ex. 53, Am. Psychological Ass'n, *Sexual Orientation, Parents, & Children* (July 2004); Ex. 54, Am. Acad. of Child & Adolescent Psychiatry, *Gay, Lesbian, Bisexual, or*

*Transgender Parents Policy Statement* (2009); Ex. 55, Child Welfare League of Am., *Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults*.

Thus, the evidence shows that same-sex couples can and do have children and that those children are as well-adjusted as children of heterosexual couples. Yet Section 32 hinders the stability of same-sex parents and their children. *See Goodridge*, 798 N.E.2d at 963 ("[T]he task of child rearing for same-sex couples is made infinitely harder by their status as outliers to the marriage laws."); Lamb Decl. ¶ 47 ("Many lesbians and gay men already are parents, and it is in the best interests of their children for these families to have equal access to the protections, benefits, social legitimacy and support afforded through marriage."). Recognizing this, the American Academy of Pediatrics "concludes that it is in the best interest of children that they be able to partake in the security of permanent nurturing and care that comes with the civil marriage of their parents, without regard to their parents' gender or sexual orientation." Ex. 50, Perrin, *supra* at 1381.

As the Supreme Court so aptly explained in *Windsor*, the same-sex marriage ban "humiliates tens of thousands of children now being raised by same sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Windsor*, 133 S. Ct. at 2694. Section 32 does nothing to encourage stable environments for child rearing. As a result, "encouraging stable environments for child-rearing" cannot provide a rational basis for Section 32. *See Varnum v. Brien*, 763 N.W.2d 862, 899 (Ia. 2009) ("Plaintiffs presented an abundance of evidence and research, confirmed by our independent research, supporting the proposition that the interests of children are served equally by same-sex parents and opposite-sex parents.").

204156357 v8

3.      <u>Section 32 Impermissibly Targets Homosexuals.</u>

Because every asserted basis for Section 32 fails to pass muster under even the most forgiving standard, this Court must conclude that Section 32 was designed to disadvantage same-sex couples—a clear violation of the Constitution. *Windsor*, 133 S. Ct. at 2693 ("The Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment.") (quoting *Dep't of Agri. v. Moreno*, 413 U.S. 528, 534-35 (1973)); *Romer*, 517 U.S. at 635 ("We must conclude that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do.").

The legislative history of Texas' statutory and constitutional provisions banning same-sex marriage illustrates the animus against gay men and lesbians and the motivation behind the bans. Although it did not rely on these grounds in its recent defense of Section 32, the arguments in favor of Family Code § 6.204 claimed that marriage between a man and a woman gives "women and children the surest protection against poverty and abuse, provides for the healthy psychological development of children, and avoids health risks of same-sex relations and promiscuity." House Research Org., Report on Major Issues, 78th Leg., Reg. Sess. (Tex. 2003). Texas was not content merely to deprive same-sex couples of the title "married," but even went so far as to enact a provision ensuring that same-sex couples could *never* obtain any rights even similar to marital rights. Tex. Const., art. I, § 32(b).

In the House of Representatives, it was claimed that same-sex marriage "could lead to the recognition of bigamy, voluntary incest, pedophilia, and group marriage." House Research Org., Daily Floor Report, 78th Leg., Reg. Sess. (Tex. April 29, 2003). The necessary implication of these statements, of course, is that gay men and lesbians are more likely than heterosexuals to be poor and abusive, injurious to children's psychological development, and engage in risky

40

"promiscuous" acts; and that they are akin to bigamists, the incestuous, pedophiles, and polygamists. These shameful slurs disclose the unfounded fear and irrational beliefs that motivated Section 32 and show that it impermissibly targets gay men and lesbians.

Section 32 does not have a rational basis and it impermissibly targets a minority. Thus it cannot withstand constitutional scrutiny.

### D.   The Refusal To Recognize Same-Sex Marriages Lawfully Performed In Other States Deprives Plaintiffs De Leon and Dimetman Equal Protection And Due Process.

Under Texas law, marriages are presumptively valid in Texas and will be upheld against claims of invalidity "unless a strong reason exists for holding the marriage void or voidable." Tex. Fam. Code Ann. § 1.101. Consistent with that presumption, "[t]he general rule is that a marriage valid where contracted is valid everywhere, and that one void where contracted is void everywhere," *Portwood v. Portwood*, 109 S.W.2d 515, 522 (Tex. Civ. App. 1937), and "[t]he validity of a marriage is generally determined by the law of the place where it is celebrated," *Husband v. Pierce*, 800 S.W.2d 661, 663 (1990). *See also Tex. Emp'r Ins. Ass'n v. Borum*, 834 S.W.2d 395, 399 (Tex. App. 1992) ("[T]he validity of a marriage is generally determined by the law of the place where it is celebrated rather than the law of the place where suit is filed."); *Braddock v. Taylor*, 592 S.W.2d 40, 42 (Tex. Civ. App. 1979) ("The validity of a marriage is determined by the law of the place where it was celebrated."). Thus, even if Texas itself would not allow a particular marriage to occur within its borders, that marriage generally must be recognized in Texas if lawfully performed in another state or country. *E.g., Husband*, 800 S.W.2d at 662-63 (although no county clerk in Texas could have lawfully issued a marriage license to Texas girl without her parents' consent or a court order, marriage performed in Mexico was legal and would be recognized under Texas law); *cf. Braddock*, 592 S.W.2d at 42 (refusing to recognize common law marriage in Texas because California did not recognize common-law

41

marriages); *Nevarez v. Bailon*, 287 S.W.2d 521, 523 (Tex. Civ. App. 1956) (same because

common-law marriage would not have been recognized in Mexico).

Thus, because Texas will recognize heterosexual marriages from other states—even ones

that might not be permissible in Texas—the failure to recognize same-sex marriages in Texas

squarely implicates equal protection.  Texas' sole ground for refusing to recognize lawful

marriages from other states is that they are void under Texas public policy.[7] Fam. Code, § 6.204;

*see also Nevada v. Hall*, 440 U.S. 410, 422 (1979) (Full Faith and Credit Clause does not require

one state to apply another state's law in violation of its own legitimate public policy).  But

where, as here, that public policy is nothing more than a discriminatory animus that targets an

unpopular minority, the law cannot stand: a legislative "'desire to harm a politically unpopular

group cannot' justify disparate treatment of that group." *Windsor*, 133 S. Ct. at 2693 (quoting

*Moreno*, 413 U.S. at 534-535).  "The guaranty of 'equal protection of the laws' is a pledge of the

protection of equal laws." *Romer*, 517 U.S. at 633-634 (quoting *Skinner v. Oklahoma ex rel.*

*Williamson*, 316 U.S. 535, 541 (1942)).

---

[7] Defendants may argue that the traditional rule that the place of celebration does not govern, and courts should instead apply the significant contacts test under a choice of law analysis to marriage cases. *In re Marriage of J.B. and H.B.*, 326 S.W.3d 654, 668-69 (Tex. App. 2010), *rev. granted.* Aug. 23, 2013; *Seth v. Seth*, 694 S.W.2d 459, 462–64 (Tex. App. 1985). However, that test makes no cognizable difference, because even under traditional choice of law analysis, the Texas Supreme Court has stated that Texas courts will enforce a valid contractual choice of law provision. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984) (stating that significant contacts test would apply "except those contract cases in which the parties have agreed to a valid choice of law clause").  That would mean that a married couple could agree contractually to have their marriage governed by the law of another state and Texas would respect that decision under its choice of law analysis.  Thus, the type of choice of law analysis this Court uses is irrelevant.  All that matters is that under either approach to choice of law, Texas could still recognize a marriage under the law of another state even if that law were not one that could otherwise be entered into in Texas in the first instance and void for public policy would be the only grounds for refusing to recognize such marriages.

42

As discussed above (Argument, Section I.B.1.), because Section 32 targets gays and lesbians, a suspect classification, the refusal to recognize same-sex marriages should be subject to heightened scrutiny. However, under either heightened scrutiny or rational basis, Defendants can offer no legitimate justification for Texas' refusal to recognize De Leon and Dimetman's marriage. Having already married in another state, declaring that marriage void undermines the alleged goal of fostering stable relationships and promoting families in which children are raised by both parents. Indeed, despite being married at the time De Leon conceived and gave birth to C, Dimetman was forced formally to adopt C so that she would be recognized as C's mother. In other instances, however, where same-sex married couples have had children in states that recognize their marriages—and thus do not require adoptions to confer parental rights—parents could find that moving to Texas may strip them of parental rights that they had by virtue of their marital relationship. Thus, far from serving the purpose of promoting families and stable relationships, the refusal to recognize existing marriages lawfully performed in other states has the exact opposite effect.

Nor can Defendants demonstrate how refusing to recognize same-sex marriages performed in other states promotes procreation. As discussed above, there is no evidence that same-sex marriage affects opposite-sex marriages or procreation among heterosexuals. (Argument, Section I.C.) To the contrary, despite their Massachusetts marriage not being recognized by Texas, De Leon and Dimetman had a child after they were married. So how does Texas refusing to recognize that marriage promote procreation? Do Defendants believe they and other married same-sex couples will be so discouraged by the lack of state recognition that they will divorce their same-sex spouses, find heterosexual spouses, and then have children within heterosexual marriages? The notion is preposterous.

204156357 v8

Ultimately, as an Ohio district court recently found when confronted with this same question, the only "purpose served by treating same-sex married couples differently than opposite-sex married couples is the same improper purpose that failed in *Windsor* and in *Romer*: 'to impose inequality' and to make gay citizens unequal under the law." *Obergefell v. Kasich*, No. 1:13–cv–501, 2013 WL 3814262, *6 (S.D. Ohio July 22, 2013). Because Ohio, like Texas, recognized other state marriages that might otherwise not be permitted in Ohio, the *Obergefell* court held that Ohio's refusal to recognize out-of-state same-sex marriages violated equal protection and issued an injunction requiring the state to recognize a same-sex marriage lawfully performed in Maryland.

*Obergefell* also held that the refusal to recognize the plaintiffs' out-of-state marriage violated due process, particularly implicating the associational rights discussed in cases like *Griswold*, 381 U.S. at 486, and *Zablocki*, 434 U.S. at 384. *Obergefell*, 2013 WL 3814262, at *6. "Even if there were proffered some attendant governmental purpose to discriminate against gay couples, other than to effect pure animus, it is difficult to imagine how it could outweigh the severe burden imposed by the ban imposed on same-sex couples legally married in other states." *Id*. Even under a rational-basis test, the court could not find any grounds for refusing to recognize "lawful, out-of-state same sex marriages that is not related to the impermissible expression of disapproval of same-sex married couples." *Id*. The same is true here.

Defendants may argue that due process is not implicated by the refusal to recognize out-of-state marriages because same-sex couples like De Leon and Dimetman are still able to exercise their "right to marry." But refusing to recognize lawful out-of-state marriages is tantamount to refusing to permit people to marry at all. As the Supreme Court has recognized, marriage conveys a host of rights, responsibilities, and benefits beyond the mere act of engaging

in the ceremony of marrying. *Windsor*, 133 S. Ct. at 2694-66 (listing various benefits and rights). Just as the Supreme Court recognized that DOMA "divests married same-sex couples of the duties and responsibilities that are an essential part of married life and that they in most cases would be honored to accept were DOMA not in force," Section 32 prevents Texas same-sex married couples from taking on those duties and responsibilities. *Id.* at 2695; *see also Turner*, 482 U.S. at 94 (finding even considering limitations imposed by prison conditions, "important attributes of marriage remain" such as being "expressions of emotional support and public commitment", matters of religious significance, precondition for benefits like Social Security, property rights, and legitimation of children). By declaring existing, lawful marriages void and denying married couples the rights, responsibilities, and benefits of marriages, Texas denies same-sex couples who have been married in other states of due process just as it does to same-sex couples that seek to marry within in Texas. That they are able to obtain a marriage certificate or hold a ceremony in another state does not change that.

Accordingly, the refusal to recognize same-sex marriages lawfully performed in other states violates the equal protection and due process rights of couples like De Leon and Dimetman.

### E.   *Baker v. Nelson* Is No Longer Binding Precedent Because Subsequent Cases Undermined Its Reasoning.

In *Baker v. Nelson*, 409 U.S. 810 (1972), the Court dismissed "for want of a substantial federal question" an appeal from a Minnesota Supreme Court decision rejecting due process and equal protection challenges to Minnesota's refusal to issue a marriage license to a same-sex couple. *See Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971). Supreme Court summary dismissals are binding only "on the precise issues presented and necessarily decided." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). Even then, summary dismissals are binding on lower

courts only to the extent that they have not been undermined by subsequent cases. *Hicks v. Miranda*, 422 U.S. 332, 344 (1975). *Baker* was decided more than forty years ago, and subsequent doctrinal and societal developments completely undermine it.

      *Baker's* summary dismissal is not binding on the due process question here because it is impossible to reconcile with the Court's subsequent decisions in *Lawrence* and *Windsor*. As the Court found in *Lawrence*, the Constitution protects "personal decisions relating to marriage, procreation, contraception, family relationships, [and] child rearing" and gays and lesbians "may seek autonomy for these purposes." *Lawrence*, 539 U.S. at 574. More recently, *Windsor* recognized that citizens' decisions to marry someone of the same-sex are protected by the Constitution. *Windsor*, 133 S. Ct. at 2694.

      Similarly, *Baker's* equal protection ruling also has no precedential value. First, in *Baker* the plaintiffs made an equal protection challenge based solely on sex discrimination—not on discrimination based upon sexual orientation. *Baker*, 291 Minn. at 315; Jurisdictional Statement at 16, *Baker v. Nelson*, No. 71-1027 ("The discrimination in this case is one of gender."). *Baker* was decided before the Supreme Court recognized that sex is a quasi-suspect classification. *Frontiero*, 411 U.S. at 688. *Baker* also was decided before the Court recognized that the Constitution, including the Equal Protection and Due Process Clauses, protect gay men and lesbians. *Windsor*, 133 S. Ct. at 2694; *Lawrence*, 539 U.S. at 574; *Romer*, 517 U.S. at 635-36. Lastly, *Baker* was factually distinguishable, as it did not involve a state statute or constitutional amendment prohibiting same-sex marriage, and it did not involve a same-sex couple married in another state. *See Baker*, 191 N.W.2d at 185; *see Ill. State Bd. of Elec. v. Socialist Workers*, 440 U.S. 173, 182 (1979) (finding summary affirmance was not binding on "[q]uestions which

46

merely lurk in the record, are not resolved, and no resolution of them may be inferred") (internal citations and quotations omitted).

Because *Baker* is premised on the subsequently rejected notion that the Constitution does not protect gay men and lesbians from discrimination, *Baker* is not controlling of the issues here.

## II.     The Court Should Issue A Preliminary Injunction Against Defendants' Enforcement Of Section 32.

Courts consider four factors to determine if a preliminary injunction is proper: 1) the plaintiffs' likelihood of success on the merits; 2) the threat of irreparable harm to the plaintiffs; 3) whether the plaintiffs' potential injury outweighs any potential harm the defendant may suffer; and 4) whether the preliminary injunction disserves the public interest. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 332 (5th Cir. 1981).

Plaintiffs satisfy each of these requirements.  Plaintiffs have shown that Section 32 and its related statutes violate their Fourteenth Amendment due process and equal protection rights. Thus, Plaintiffs are likely to succeed on the merits.  Because Section 32 violates their constitutional rights and Defendants can point to no harm that they will suffer if they are required to recognize and allow Plaintiffs' marriages, the equities greatly favor an injunction. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.  If anything, the system is improved by such an injunction.").  Similarly, a preliminary injunction will not disserve the public interest. *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) ("The School Prayer Statute is unconstitutional so the public interest was not disserved by an injunction preventing its implementation.").  To the contrary, protecting Plaintiffs' constitutional rights serves the public interest. *See Giovani Carandola*, 303 F.3d at 521 ("[W]e agree with the district court that

47

upholding constitutional rights surely serves the public interest."); *Jornaleros de Las Palmas v. City of League City*, Civil Action No. H-11-2703, 2013 WL 2180013, at *15 (S.D. Tex. May 17, 2013).

Finally, Plaintiffs suffer irreparable harm, and will continue to suffer, irreparable harm because of Defendants' refusal to recognize and allow their marriages. An injury is irreparable if money damages cannot compensate for the harm. *Deerfield Med. Ctr.*, 661 F.2d at 332. While Plaintiffs undoubtedly suffer financial harm from their inability to marry, *see* Badgett Decl. ¶¶ 32-68 (listing economic harms that Section 32 causes same-sex couples), no amount of money can compensate them for the denial of their constitutional rights. The fact that Section 32 denies Plaintiffs their constitutional right to marry is per se irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm."); *Deerfield*, 661 F.2d at 338 ("We have already determined that the constitutional right of privacy is 'either threatened or in fact being impaired,' and this conclusion mandates a finding of irreparable harm.") (quoting *Elrod*, 427 U.S. at 373). Thus, Section 32 irreparable harms Plaintiffs, and this factor weighs in favor of a preliminary injunction.

A preliminary injunction is necessary because there is nothing this Court can do at a later date to erase the harms that Plaintiffs suffered today and will suffer every day forward until they obtain justice. Plaintiffs will continue to suffer state-sanctioned discrimination and the stigma that accompanies it until they too can enjoy the same rights that every heterosexual enjoys. *See* Ex. 58, Decl. of Ilan S. Meyer in Supp. of Pls' Mot. for Prelim. Inj. ("Meyer Decl.") ¶ 81 (Texas' same-sex marriage ban perpetuates the beliefs "that [lesbians and gay men] are uninterested in,

48

unable to maintain, and, indeed, undeserving of close intimate relationships that are equal to those of heterosexual couples"). Plaintiffs' injury demands immediate relief.

Section 32 violates the United States Constitution, it irreparably harms Plaintiffs, and each factor necessary for a preliminary injunction weighs in favor of Plaintiffs. Thus, the Court should issue a preliminary injunction against Defendants' enforcement of Section 32.

### *Conclusion*

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an order preliminarily enjoining Defendants from enforcing any constitutional or statutory provisions, including article I, section 32 of the Texas Constitution and Texas Family Code §§ 2.001 and 6.204, that prevent Plaintiffs Phariss and Holmes from marrying on the basis that they are of the same sex, or prevents the State from recognizing Plaintiffs' De Leon and Dimetman's marriage on the basis that they are of the same sex. Plaintiffs further request that the Court enter a preliminary injunction commanding Defendant Rickhoff to issue a marriage license to Plaintiffs Phariss and Holmes.

204156357 v8

Date: November 22, 2013

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

By: __/s/ Daniel McNeel Lane, Jr._____
      Barry A. Chasnoff (SBN 04153500)
      bchasnoff@akingump.com
      Daniel McNeel Lane, Jr. (SBN 00784441)
      nlane@akingump.com
      Frank Stenger-Castro (SBN 19143500)
      fscastro@akingump.com
      Jessica Weisel (Pro Hac Vice)
      jweisel@akingump.com
      Michael P. Cooley (SBN 24034388)
      mcooley@akingump.com
      Matthew E. Pepping (SBN 24065894)
      mpepping@akingump.com
      300 Convent Street, Suite 1600
      San Antonio, Texas 78205
      Phone: (210) 281-7000
      Fax: (210) 224-2035

      Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on November 22, 2013, I served Defendants a copy of the foregoing document via the Court's ECF system.

By: __/s/ Daniel McNeel Lane, Jr._____
      Daniel McNeel Lane, Jr.

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel has complied with the meet and confer requirement in Local Rule CV-7(i), and this motion is opposed. Counsel for Plaintiffs conferred with Counsel for Defendants via phone on November 22, 2013, and Defendants indicated they were opposed to Plaintiffs' motion for preliminary injunction.

By: __/s/ Daniel McNeel Lane, Jr._____
      Daniel McNeel Lane, Jr.

204156357 v8