IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CLEOPATRA DE LEON, NICOLE DIMETMAN, VICTOR HOLMES, and MARK PHARISS<br><br>Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas, KEN PAXTON, in his official capacity as Texas Attorney General, GERARD RICKHOFF, in his official capacity as Bexar County Clerk, and KIRK COLE, in his official capacity as interim Commissioner of the Texas Department of State Health Services<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 5:13-cv-982-OLG |

## JOHN ALLEN STONE-HOSKINS' RESPONSE TO STATE DEFENDANTS' MOTION FOR RECONSIDERATION AND EMERGENCY MOTION TO RESCIND OR QUASH

Intervenor John Allen Stone-Hoskins ("John") files this response to the State Defendants' Motion for Reconsideration of the Order Dated August 5, 2015 and the Emergency Motion to Rescind or, in the Alternative, to Quash (the "State's Motions") and would show:

*Preliminary Statement*

On July 7, 2015, this Court entered a final judgment declaring unconstitutional any Texas law that fails to recognize same-sex marriages as valid and lawful, and permanently enjoining Defendants from "enforcing Texas's laws prohibiting same-sex marriage." [Docket No. 98]. Texas's laws prohibiting same-sex marriage include laws and regulations that prevent

1

recognition of same-sex spouses on death certificates and birth certificates issued by the Texas Department of State Health Services ("DSHS"). Rather than complying with the Final Judgment, Defendants continue to deny Texas citizens of their constitutional rights behind a veil of obfuscation and delay and worse. For instance, the DSHS website that Interim Commissioner Kirk Cole administers, continues to instruct same-sex couples that they are not entitled to have both spouses recorded on the birth certificates issued for their children. Adoption: Frequently Asked Questions, Texas Department of State Health Services, *available at https://www.dshs.state.tx.us/vs/reqproc/faq/adoption.shtm* ("[W]hen a child is adopted by a same-sex couple, one of the adoptive parents must choose to be designated on the birth certificate as the father, in the case of a male couple, or the mother, in the case of a female couple. The other adoptive parent is not listed."). Worse still, the chief legal officer of the State of Texas, Attorney General Ken Paxton, has served as lead cheerleader for these contemptuous acts.

Almost from the minute that the Supreme Court issued its decision in *Obergefell*, Paxton virtually incited employees of the State of Texas to ignore and resist it. On the day of the decision, Paxton described the decision as "flawed," and asserted that "no court, no law, no rule, and no words will change the simple truth that marriage is the union of one man and one woman." Ken Paxton, *Attorney General Ken Paxton: Following High Court's Flawed Ruling, Next Fight is Religious Liberty* (June 26, 2015), *attached hereto as* **Exhibit A** (the "June 26th Statement"). Two days later, Paxton asserted publicly that the Supreme Court had "ignored the text and spirit of the Constitution to manufacture *a right that simply does not exist*." Ken Paxton, *Attorney General Paxton: Religious Liberties of Texas Public Officials Remain Constitutionally Protected After Obergefell v. Hodges* (June 28, 2015), *attached hereto as* **Exhibit B** (the "June 28th Statement") (emphasis added). Paxton not only characterized the *Obergefell* decision as

"flawed direction," but branded the decision as "lawless" in three different places in his statement. *Id.*

Following Paxton's lead, after entry of Final Judgment in this case, Interim Commissioner Cole and DSHS failed and refused to amend the death certificate of John's late spouse until ordered to do so by the Court. The history of John's efforts to obtain an amended death certificate are documented in his Emergency Motion to Intervene and for Contempt (the "Contempt Motion") [Docket No. 104]. Further, undersigned legal counsel communicated with Paxton's office in the days leading up to filing the Contempt Motion in an effort to reach a resolution without filing suit. *See id.* at 2. On Monday August 3, 2015, the DSHS informed John's counsel that Defendant Commissioner Cole and the DSHS would not correct James's death certificate absent a court order compelling them to do so.[1] *Id.* Even after DSHS issued an amended death certificate, as ordered by this Court, the Attorney General's office has indicated that DSHS has no policy in place concerning the issuance of death certificates to survivors of same-sex spouses.

Paxton and Cole's contemptuous attitude and acts have consequences far beyond the single case of John Stone-Hoskins, whose situation is hardly unique. This Court has been contacted by counsel representing numerous citizens in similar circumstances. Rather than forcing each of these citizens to file a motion to intervene in order to secure the rights that opposite-sex couples enjoy free of the State's interference, the Court should exercise its inherent power of contempt to assure compliance with the Final Judgment. The State's Motions should be denied.

---

[1] The defined terms in the Contempt Motion are expressly incorporated herein.

## SUPPLEMENTAL FACTUAL BACKGROUND

On August 5, 2015, John filed his Contempt Motion with the Court. [Docket No. 104]. This Court granted John's requested relief that same day. [Docket No. 105]. Specifically, this Court granted John's Emergency Motion to Intervene, his Emergency Motion for Contempt, and granted John relief in the form of ordering Commissioner Cole to "immediately issue an amended death certificate for James H. Stone-Hoskins to state that John Allen Stone-Hoskins is the surviving spouse of James, and in doing so, fully recognize their legal out-of-state marriage," *id.*—relief which was unquestionably his Constitutional right as explicitly held in *Obergefell* and recognized and ordered by this Court. *Obergefell*, 135 S. Ct. at 2604-05; [Docket No. 98]. Commissioner Cole—in the face of this Court's order and facing possible contempt of court— finally issued James's amended death certificate on August 6, 2015. [*See* Docket 106, Ex. A].

On August 6, 2015, Defendants Paxton and Cole filed their first response asking the Court to reconsider, and on August 10, 2015, they filed a second response, again asking the Court to reconsider or to quash. The State's Motions ask this Court to "reconsider its August 5 order and vacate the portion of the order setting a hearing [for contempt]."[2] [Docket No. 106 at 2]. The hearing to determine whether Defendants should be held in contempt is set for Wednesday, August 12, 2015 at 10:00 a.m. [Docket No. 105].

Since John filed his Contempt Motion, John's counsel has learned of additional instances of the Defendants' refusal to issue amended death certificates for legal out-of-state same-sex marriages. For example, as of the filing of this Response, William Kenneth Wallace is in a situation similar to the situation John faced before the Court's order to amend James's death

---

[2] Since the State's Motion only requests that the Court vacate the "portion of the order setting a hearing," John assumes the State's Motion only seeks reconsideration of the Order insofar as it grants John's Motion for Contempt and sets a hearing to determine whether Defendants should be held in contempt for disobedience of the Court's July 7 order, permanently enjoining Defendants from enforcing any of Texas's laws that prohibit or fail to recognize same-sex marriage. [*See* Docket No. 106].

certificate—despite Mr. Wallace presenting the DSHS with the proper paperwork to amend his husband's death certificate, the DSHS refused to make the amendment and thus refused to recognize his valid marriage. *See* Letter from William Kenneth Wallace's counsel to the Honorable Orlando L. Garcia dated August 6, 2015, *attached hereto as* **Exhibit D** ("William's Letter"). Similarly, under a different set of circumstances, the DSHS continues to refuse to issue accurate two-parent birth certificates to children born to Susan Leigh Jorgeson and Robin Bass Jorgeson, a lawfully married same-sex couple. *See* Letter from Susan Leigh Jorgeson and Robin Bass Jorgeson's counsel to the Honorable Orlando L. Garcia dated August 7, 2015, *attached hereto as* **Exhibit E** ("Susan and Robin's Letter"). Robin gave birth to W.S.J. on August 2, 2015 (over one month after *Obergefell* and nearly one month after the Final Judgment). *Id.* Egregiously—and indefensible even under Defendants' errant "retroactivity" argument—the DSHS refused and continues to refuse to issue a two-parent birth certificate for W.S.J. on August 4, 2015. *Id.*

## RESPONSE TO THE STATE'S MOTIONS

The Contempt Motion and the legal issues involved are simple. John's struggle was based upon a set of facts that are virtually identical to that of the named plaintiff in *Obergefell*. The Supreme Court explicitly ruled on this set of facts, and its decision made clear that this Court was correct in February 2014—sixteen months earlier—when it declared unconstitutional Texas's legal restrictions on recognition of lawful same-sex marriages. Accordingly, the Fifth Circuit affirmed this Court's prior decision, and directed this Court to enter the Final Judgment from which no Defendant appealed. Despite the nearly identical fact pattern in *Obergefell*, Defendants have used that decision as a purported basis to refuse to comply with this Court's Final Judgment. Defendants' attempt to make this a "complex, fact-specific inquiry" to be

5

"resolved in subsequent legal proceedings" based, in part, on their inapplicable "retroactivity" argument is a bad-faith attempt to misdirect and distract the Court from their blatant and intentional contempt.

I. ***Obergefell* Addressed and Decided an Issue Upon the Same Facts as John's**

The petitioners in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) were 14 same-sex couples and two men whose same-sex partners were deceased. *Id.* at 2593. Petitioner James Obergefell's situation was identical to John's. *See id.* at 2594-95. As explained by Justice Kennedy:

> Petitioner James Obergefell, a plaintiff in the Ohio case, met John Arthur over two decades ago. They fell in love and started a life together, establishing a lasting, committed relation. In 2011, however, Arthur was diagnosed with [ALS]. This debilitating disease is progressive with no known cure. Two years ago, Obergefell and Arthur decided to commit to one another, resolving to marry before Arthur died. To fulfill their mutual promise, they traveled from Ohio to Maryland, where same-sex marriage was legal. It was difficult for Arthur to move, and so the couple were married inside a medical transport plane as it remained on the tarmac in Baltimore. Three months later, Arthur died. Ohio law does not permit Obergefell to be listed as the surviving on Arthur's death certificate. By statute, they must remain strangers even in death, a state-imposed separation Obergefell deems "hurtful for the rest of time" . . . . He brought suit to be shown as the surviving spouse on Arthur's death certificate.

*Id.* John's situation is identical to James Obergefell's. There is nothing to weigh, balance or consider here, no "retroactivity analysis" being eschewed– this is the end of the State's inquiry and a clear directive to issue an amended death certificate to John and all same-sex couples similarly situated. Suggesting otherwise strains all credibility and is a transparent attempt to avoid being held accountable for openly defying this Court.

The *Obergefell* petitioners brought suit upon the premise that various states' officials violated the 14th Amendment by denying the right to marry or to have their marriages, lawfully performed in another state, given full recognition. *Id.* The Supreme Court granted certiorari on

6

two issues: (1) whether the 14th Amendment requires a state to license a marriage between two people of the same sex and (2) "whether the Fourteenth Amendment requires a State to recognize a same-sex marriage licensed and performed in a State which does grant that right." *Id.* The Court, in addition to holding that the Fourteenth Amendment requires states to issue marriage licenses for same-sex couples, explicitly held "there is no lawful basis for a state to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character." *Id.* at 2604-05, 2608. In short, there is nothing "new" about John's situation as the Defendants —it was squarely resolved in *Obergefell*.

## II. John's Motion to Intervene Was Proper and Supports a Finding of Contempt

As already explained in the Contempt Motion, the decision whether to allow a third party to permissively intervene in a lawsuit is within the sound discretion of this Court. *United States v. Texas*, 457 F.3d 472, 476 (5th Cir. 2006). This is the same regardless of whether a case is closed. *Id.* In fact, a court even has the discretion to reopen an administratively closed case *sua sponte*. *Id.* Defendants cite the general principle that in the Fifth Circuit "intervention attempts after final judgments are ordinarily looked upon with a jaundiced eye." [Docket No. 106 at 2 (*citing Staley v. Harris Cnty. Tex.*, 160 F. App'x 410, 412 (5th Cir. 2005)]. This is not an "ordinary case" and this Court exercised its discretion and properly granted the Contempt Motion.

### A. The Emergency Circumstances Surrounding this Extraordinary Situation Warranted the Court's Swift Action

This not an ordinary case for two reasons. First, this case and the Contempt Motion involve officials of the State of Texas disobeying the Final Judgment and the Supreme Court's explicit ruling in *Obergefell*, causing a substantial deprivation of John's, and a multitude of similarly situated Texans', Constitutional rights. Courts, including the Fifth Circuit, have

7

recognized the extraordinary nature of such a circumstance for the purpose of intervention. *Cf. Texas*, 457 F.3d at 474-76 (allowing party to intervene in a long-since administratively closed case to enforce a district court's desegregation order); *see generally Roe v. Patton*, No. 2:15-cv-00253-DB, 2015 WL 4476734, at *4 (D. Utah July 22, 2015) (granting post-*Obergefell* injunction and stating, "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). Second, while Defendants make much ado about this Court's swift action in granting the Contempt Motion, they fail to acknowledge the truly emergent nature of the relief John requested. John is terminally ill and could die at any time. Such circumstances warrant emergency relief—especially in light of *Obergefell* and the Final Judgment requiring recognition of valid out-of-state same-sex marriages. Furthermore, considering John's repeated pleas for recognition of his marriage to James immediately after *Obergefell*, and John's counsel's pre-Contempt Motion discussions with Attorney General Paxton's office and the DSHS, Defendants can hardly feign surprise by the Contempt Motion.[3]

### B. The Contempt Motion Seeks Present Relief Under the Final Judgment, as Informed by *Obergefell*, Not Retroactive Relief

The ground for the relief sought by the Contempt Motion was straightforward. It was brought under the Final Judgment, as informed by *Obergefell*. The Final Judgment enjoined officials of the State of Texas from enforcing laws that prohibit recognition of valid out-of-state same-sex marriages. As *Obergefell* made explicitly clear, listing surviving same-sex spouses on death certificates is now well-settled by binding Supreme Court precedent and is a central component of recognition of out-of-state same-sex marriages. John sought to have his New Mexico marriage to James recognized by the State of Texas on James's death certificate.[4] John not only filed all requisite

---

[3] John's counsel reached out to the Office of the Attorney General and the DSHS to advise them that John would seek emergency judicial relief if Defendants continued to refuse to amend James's death certificate.

[4] Defendants, after conceding that the Final Judgment required the State of Texas to enforce "the right to marry" and to "have an existing marriage recognized," try to distinguish John's situation from that where both spouses are still living.. [*See* Docket No. 106 at 2-3 & n.1]. Putting aside the fact that *Obergefell* made no

8

paperwork for an amendment, but also made multiple pleas to the State of Texas to make this change and recognize his marriage so that he can move forward with planning his own estate. Defendants refused to do so. By so refusing, Defendants were enforcing Texas's laws prohibiting recognition of same sex marriage. Defendants intentionally and deliberately failed and refused to comply with the Final Judgment. And despite finally complying with respect to James's death certificate, Defendants continue to refuse to comply with the Final Judgment with respect to other similarly situated Texans.

Still, Defendants attempt to misdirect and distract this Court from their straightforward refusal to comply with the Final Judgment by introducing their red-herring "retroactivity" defense. At the heart of this misdirection is the heartless suggestion that *Obergefell* and the Final Judgment do not apply because James is dead and died before *Obergefell* or the Final Judgment. [*See* Docket No. 106 at 2-3 & n.1]. Because James is dead, Defendants argue, applying *Obergefell* and the Final Judgment would be a "retroactive" application that must be addressed in subsequent legal proceedings. *See id.* But this is not the complex, fact-specific inquiry Defendants make it out to be. Simply put, the Contempt Motion does not seek retroactive relief—it seeks present relief.

More specifically, the Contempt Motion seeks present recognition of a pre-existing marriage lawfully performed in New Mexico in 2014. *It does not seek the State of Texas to retroactively validate a previously invalid marriage.*[5] John and James's marriage existed, was valid, and

---

distinction between out-of-state marriages that exist or previously existed as it relates to the right to recognition, and putting aside that *Obergefell* decided that a state must go back to amend death certificates to recognize surviving spouses, the Final Judgment made no mention of enjoining Texas laws prohibiting the recognition of existing out-of-state marriages. [*See* Docket No. 98]. The Final Judgment, instead, enjoins enforcement of Texas laws that prohibit "recognizing same-sex marriage." *Id.* Defendants' attempt to insert an "existing marriage" qualification into the Final Judgment is, at best, a mischaracterization of the Final Judgment. [*See* Docket No. 106 at 2-3 & n.1].

[5] While retroactivity could *possibly* become a contested issue in certain circumstances, such an issue is not applicable here. A circumstance where retroactivity could *possibly* be an issue is where a same-sex or transgender couple purport that they were married in Texas prior to *Obergefell*. The possible retroactive issue could be whether a prior purported marriage, while invalid (and also not valid in any other state) prior to *Obergefell*, retroactively becomes valid after *Obergefell*. In other words, the question would be whether an actual invalid marriage itself becomes valid. An example of this is currently pending with the Texas Supreme Court in *Delgado v. Araguz*, No. 14-0404 (Tex.). In *Delgado*, a transgender woman and a man were married under Texas law; after the man died, the mother of the man sought to invalidate their marriage on the basis that Texas law did not recognize the transgender woman as a woman, but instead as a man; accordingly, the argument went, the marriage was void because it was

recognized by New Mexico prior to *Obergefell*. John seeks the State of Texas to presently recognize that an already legal marriage was performed in New Mexico on James's death certificate and that the out-of-state legal marriage existed at the time of James's death. Furthermore, even if the Contempt Motion sought retroactive relief—which it does not—this argument has already been rejected by the courts. For example, in *Hard v. Robert Bentley*, No. 2:13-cv-00922-WKW-SRW, Docket Nos. 90, 93, 94, 95 (M.D. Ala.), the court summarily rejected an intervening defendant's argument that *Obergefell* did not apply retroactively to a valid out-of-state same-sex marriage where one of the spouses had died prior to *Obergefell*. Relatedly, in *Taylor v. Brasuell*, No. 1:14-cv-00273-REB, 2015 WL 4139470, at *8 (D. Idaho July 9, 2015) the court granted summary judgment and ordered a state official to approve and facilitate the plaintiff's internment, together with her spouse, in a state cemetery. While the primary legal issue was mootness after *Obergefell*, the court's decision recognized that the out-of-state same-sex marriage at issue had to be fully recognized by the state for purposes of approving future interment together as spouses where the plaintiff's spouse had died years earlier. *Id.* at 1-2, 8.

### C. Defendants' Heirship Argument is Utterly Inapposite

Defendants' suggestion that John initiate a probate proceeding to get relief is troubling, bordering on absurd. The State's solution is for John to suffer through a lengthy process that no similarly situated opposite-sex couple would be required to undertake. Such an approach ignores John's Constitutional right to the dignity of having the State of Texas recognize his valid out-of-state marriage, as well as all of the civil effects that accompany the recognition of a marriage. *See Obergefell*, 135 S. Ct. at 2608. John yearned for that; the Constitution guarantees it. *Id. Obergefell* puts an end to Defendants' suggestion:

---

between two men and same-sex marriages were prohibited in Texas. *Id.* The trial court invalidated the marriage and the Texas Thirteenth Court of Appeals reversed; the mother then appealed to the Texas Supreme Court.

> [T]he [same-sex] recognition bans inflict substantial and continuing harm on same-sex couples . . . . [the petitioners'] plea is that they do respect [marriage], respect it so deeply that they seek its fulfillment for themselves. Their hope is not to be condemned to live in loneliness, excluded from one of civilization's oldest institutions. They ask for equal dignity in the eyes of the law. The Constitution grants them that right.

*Id.* at 2607-08.

## III. Holding Defendants in Contempt is Proper

The Fifth Circuit, in affirming this Court's decision, recently warned: "*Obergefell* in both its Fourteenth and First Amendment iterations, is the law of the land and, consequently, the law of this circuit and *should not be taken lightly by actors within the jurisdiction of this court.*" *De Leon v. Abbott*, No. 14-50196, 2015 WL 4032161, at *2 (5th Cir. July 1, 2015) (emphasis added); *see also Costanza v. Caldwell*, No. 2014-CA-2090, 2015 WL 4094655, at *2 (La. July 7, 2015) ("[I]nsofar as plaintiffs seek the benefits of the civil effects of marriage, *Obergefell* compels the conclusion that the State of Louisiana may not bar same-sex couples from the civil effects of marriage on the same terms accorded to opposite-sex couples.").[6]

Courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-65 (1980). This includes the "firmly established" recognition that "the power to punish for contempt is inherent in all courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). This contempt power "reaches both conduct before the court and that beyond the court's confines, for the underlying concern that gave rise to the contempt power was not merely the disruption of

---

[6] On a related note, Defendants, as elected or appointed officials of the State of Texas, were required to swear an oath to "preserve, protect and defend the Constitution and laws of the United States." Tex. Const. Art. 16, § 1; *see* U.S. Const. Art. VI, Clause 3. And as a Louisiana State Supreme Court Justice recently commented in the wake of *Obergefell*, and despite his disagreement with the ruling, "Judges are bound by oath to follow the law regardless of our personal opinions, and we insist that everyone appearing before us do the same. The dissent opinion suggests we should not follow [*Obergefell*]. However, it cites no authority. It cannot, because there is none to support its position. I am bound by my oath as an elected justice of this state to abide by the rule of law." *Costanza*, 2015 WL 4094655, at *4. Surely Attorney General Paxton does not suggest that he is not similarly bound by his oath of office to follow the rule of law, and if he does should be made to answer to this Court on the record.

11

court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Id.* (internal citations omitted).

As for holding, or threatening to hold, state officials in contempt, "[w]hen an unconstitutional legislative enactment is void, a state official who enforces that law comes into conflict with the superior authority of the Constitution, and therefore is stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Virginia Office for Protection and Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011) (internal citations omitted). This is necessary to "permit the federal courts to vindicate federal rights." *Id.* Accordingly, the threat of contempt has been used against state officials as senior as governors. *See, e.g.*, *Coleman v. Brown*, 922 D. Supp. 2d 1004, 1050, 1054 (ED. Cal. 2013) (noting that California officials, including Governor Brown, had acted in open defiance of the court's order, that "the rule is applicable to Governor Brown, as well as the lowliest citizen," and the court had "exercised considerable restraint" in not holding contempt hearings). And even the United States Attorney General has been held in contempt by a federal district court. *See Socialist Workers' Party v. Attorney General of the United States*, 458 F. Supp. 895 (S.D.N.Y. 1978), *vacated on other grounds*, 596 F.2d 58 (2d Cir. 1979).

Here, finding Defendants in contempt is appropriate for several reasons. First, not only did Defendants flat-out refuse to amend James's death certificate and comply with *Obergefell* and the Final Judgment until specifically ordered to do so (and in the face of contempt), Defendants and the State of Texas have disregarded and continue to blatantly disregard the Supreme Court's *Obergefell* ruling and the Final Judgment on a systematic, all-encompassing, State-wide level.[7] *See, e.g.*, William's Letter; Susan and Robin's Letter. This is the definition of

---

[7] It could be argued that Defendants and the State of Texas are making a hopeless attempt to revive the long-since invalidated and unconstitutional doctrine of nullification. *See, e.g.*, *Cooper v. Aaron*, 358 U.S. 1, 16-17

contempt. *See Contempt*, <u>Black's Law Dictionary</u> (4th Pocket Ed. 2011) (defining contempt as "conduct that defies the authority or dignity of a court or legislature").[8] Attorney General Paxton has sown the seeds of contempt by publicly disparaging the Supreme Court and *Obergefell* from day one and encouraging Texas officials like Commissioner Cole to disobey the *Obergefell* opinion and the Final Judgment. *See* June 26th Statement; June 28th Statement; Paxton Opinion.

Second, Defendants issuing James's amended birth certificate after this court specifically ordered them to do so—and in the face of a contempt hearing—does not absolve their previous acts of contempt. The fact remains that not only has Attorney General Paxton publicly encouraged state officials to disobey *Obergefell* and the Final Judgment, but both Defendants conspired to intentionally fail and refuse to comply with this Court's order and amend James's death certificate despite John filing the proper paperwork and pleading with the DSHS to do so. *Defendants' response was that they refused to comply unless a court compelled them to specifically amend James's death certificate.* Such contempt cannot be retroactively absolved and Defendants should be held accountable for their actions.

Third, a finding of contempt is necessary because there are countless Texans similarly situated to John that continue to be denied their rights—in contravention of the Final Judgment and despite this Court's August 5th order. Indeed, since this Court's August 5th order, the State has indicated the Department has no policy going forward. In other words, their approach is they will only issue a document when a court orders them to. This is the essence of contempt. Accordingly, the contempt hearing is needed, at the very least, for the purpose of having

---

("[*Brown v. Board of Education* can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted ingeniously or ingenuously.").

[8] Absent any defense for their open defiance of this Court's Final Judgment, Defendants devote several pages of their Motion to discussing the "law of contempt *See* Motion at 5-8. John submits that the facts before the Court clearly satisfy the standard set forth in Defendants' Motion.

13

Defendants explain to this Court why they continue to fail and refuse to comply with the Final Judgment, and to permit this Court to censure Defendants for their contumacious conduct.

Finally, contrary to Defendants' assertion, Attorney General Paxton is a proper party to the Contempt Motion. Attorney General Paxton is the chief law enforcement officer of the State of Texas. Tex. Const. Art. 6, § 22. He does not just advise state actors, he formulates legal policy. *See id.* Indeed, public officials may seek to avoid personal liability for official acts by showing good faith reliance on a Texas Attorney General's opinion, even if a court later holds that the opinion is erroneous. *Weaver v. Head*, 984 S.W.2d 744, 746 (Tex. App.—Texarkana 1999, no pet.) (citing *City of Garland v. Dallas Morning News*, 969 S.W.2d 548 (Tex. App.—Dallas 1998), *aff'd*, 22 S.W.3d 351 (Tex., 2000)). Furthermore, Paxton can even sue to compel Texas state departments, such as the DSHS, to comply with the U.S. Constitution and has the exclusive right and power to represent state agencies. Tex. Att'y Gen. Op. LO-96-124. Indeed, Attorney General Paxton is indirectly responsible for Commissioner Cole's and countless other state officials' acts of contempt in disobedience of the Final Judgment. Attorney General Paxton is far from an innocent bystander.

**IV.  Extraordinary Circumstances Exist Compelling the Attendance of Attorney General Paxton and Interim Commissioner Cole**

This case's extraordinary circumstances and Attorney General Paxton's and Commissioner Cole's extraordinary and continuing contempt require their attendance at the August 12 hearing. Attorney General Paxton and Commissioner Cole seek to avoid their day in court by arguing that they have only been "informed of the events that are the subject of the Court's August 5 order." [Docket No. 108 at 2]. As discussed above, the Attorney General has been the most vocal opponent of the *Obergefell* decision and this Court's Final Judgment from day one, and Commissioner Cole continues to deny same-sex spouses their constitutional right to

14

be listed on a deceased spouse's death certificate. Accordingly, the State Defendants' Motion to Rescind or, in the alternative, Quash, falls flat.

The case law cited by Defendants is inapposite. This is not a case where a party seeks to depose a high-ranking official on basic factual matters available from lower-ranking officers. *In re F.D.I.C.*, 58 F.3d 1055 (5th Cir. 1995). This is a case where the Defendants have brazenly denounced decisions by the Supreme Court and this Court, and in so doing, forced a dying man to spend his remaining days seeking relief from the courts for the dignity he is already entitled to under the Constitution. Only Paxton and Commission Cole can answer for their contemptuous actions. Paxton has gone out of his way to undermine this Court's order, taking every opportunity to inject his views on the allegedly "lawless" decision and even offering to provide pro bono legal representation for state officials facing actions similar to the one before the Court, inviting the further disruption to the orderly administration of justice. *See* Ex. A. Implicit in this Court's August 5, 2015 Show Cause Order [Docket No. 105] is a finding of the requisite "extraordinary circumstances" in light of Defendants' conduct, and that record has been supplemented by the correspondence showing the State's continued "case-by-case" evaluation of others similarly situated, even after this Court's August 5th Order. *See* Exhibits D, E. Further, it is ironic that the Defendants invoke concerns about the "separation of powers" when Defendants have repeatedly flaunted this Court's Order and the Constitutional rights of similarly-situated Texans—contempt is the very tool provided to the Judiciary to ensure that Defendants follow the law.

Defendant Paxton and Cole have effectively promised that John will not be the last person to have to seek a court's intervention to obtain his or her constitutional rights. They should be required to attend the hearing and explain to the Court why they continue to flaunt

15

*Obergefell* and this Court's permanent injunction barring any further enforcement of Texas' same-sex marriage ban.

### *Conclusion*

Unfortunately, like the elected officials in Arkansas who defied the U.S. Supreme Court's decision in *Brown v. Board of Education*, and like those in Virginia who refused to recognize the equal rights of interracial couples to marry, Defendants stand on the wrong side of history, vocally, and without apology. John respectfully requests this Court to deny the State's Motions, hold the August 12th contempt hearing, and at that hearing determine the proper remedy for Defendants' contemptuous acts. John does not ask this on behalf of himself, but rather for all similarly situated Texans who continue to suffer the indignation of the State of Texas refusing to grant them their Constitutional rights, rights which are guaranteed to them by the 14th Amendment of the Constitution, the Supreme Court's *Obergefell* ruling, and this Court's Final Judgment.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

By: */s/ Daniel McNeel Lane, Jr.*
    Daniel McNeel Lane, Jr. (SBN 00784441)
    nlane@akingump.com
    Matthew E. Pepping (SBN 24065894)
    mpepping@akingump.com
    300 Convent Street, Suite 1600
    San Antonio, Texas 78205
    Phone: (210) 281-7000
    Fax: (210) 224-2035

    Andrew F. Newman (SBN 24060331)
    anewman@akingump.com
    1700 Pacific Ave., Suite 4100
    Dallas, Texas 75201
    Phone: (214) 969-2800
    Fax: (214) 969-4343

    Attorneys for Intervenor

## **CERTIFICATE OF SERVICE**

    I certify that on August 10, 2015, I served all parties a copy of the foregoing document via the Court's ECF service.

By:    */s/ Daniel McNeel Lane, Jr.*
        Daniel McNeel Lane, Jr.